# CENTRAL TRANSPORTATION COMPANY *v.* PULL-MAN'S PALACE CAR COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

No. 379. Argued January 28, 29, 1890. — Decided March 2, 1891.

A statute of a state, which authorizes the judge presiding at the trial to order a judgment of nonsuit to be entered, when in his opinion the evidence introduced by the plaintiff is insufficient in matter of law to sustain a verdict, may be followed, under Rev. Stat. § 914, in the Circuit Court of the United States held within that state; and a judgment of nonsuit rendered accordingly, upon a ruling in matter of law duly excepted to, may be reviewed by this court on writ of error.

A corporation, formed by articles of association, called a certificate or charter, under the general laws of Pennsylvania concerning manufacturing companies, with a certain capital stock, for twenty years, for " the transportation of passengers in railroad cars constructed and owned by the said company " under certain patents, carried on the business of manufacturing sleeping cars under its patents, and of hiring or letting the cars to railroad companies by written contracts, receiving a revenue from the sale of berths and accommodations to passengers. Seven years afterwards, by a special act of the legislature of Pennsylvania, the charter was extended for ninety-nine years, and the corporation was empowered to double its capital stock, and " to enter into contracts with corporations of this or any other state for the leasing or hiring and transfer to them, or any of them, of its railway cars and other personal property." The corporation forthwith entered into an indenture with a corporation of another state engaged in a similar business, by which it leased and transferred to that corporation all its cars, railroad contracts, patent rights and other personal property, moneys, credits and rights of action, for the term of ninety-nine years, except so far as the contracts and patents should expire sooner; and covenanted not to " engage in the business of manufacturing, using or hiring sleeping cars " while the indenture should remain in force; and the lessee covenanted to pay all existing debts of the lessor, and to pay to the lessor annually the sum of $264,000, during the entire term of ninety-nine years, unless the indenture should be sooner terminated as therein provided. *Held*, That this contract was unlawful and void, because beyond the corporate powers of the lessor, and involving an abandonment of its duty to the public; and therefore no action could be maintained by the lessor upon the contract, or to recover the sums thereby payable, even while the lessee had enjoyed the benefits of the contract.

THIS was an action of covenant, brought September 21, 1886, by the Central Transportation Company, a corporation of Pennsylvania, against Pullman's Palace Car Company, a corporation of Illinois, to recover the sum of $198,000, due for the last three quarters of the year ending July 1, 1886, according to the terms of an indenture of lease from the plaintiff of all its personal property to the defendant, dated February 17, 1870, and set forth in full in the declaration.

The defendant filed several pleas, one of which was "that said indenture of lease was void in law as between the parties thereto, for the want of authority and corporate power on the part of the parties thereto to make and enter into said indenture of lease; and for that the same was in excess and in violation of the charters conferring the corporate powers on said plaintiff, and of the purpose of their incorporation." The plaintiff filed a replication, traversing the averments of this plea.

The plaintiff was originally incorporated December 26, 1862, by a certificate or charter, made, acknowledged, recorded and filed in the office of the secretary of the commonwealth, as required by the general laws of Pennsylvania, which authorized companies to incorporate themselves, by voluntary act of the associates, "for the purpose of carrying on the manufacture of woollen, cotton, flax or silk goods, or of iron, paper, lumber or salt," or "for the manufacture of articles from iron and other metals, or out of wood, iron and other metals," within the State, for a term not exceeding twenty years; and provided that every corporation so formed might by its corporate name purchase, hold and convey real or personal property, "necessary or convenient to enable the said company to carry on the business or operations named in such certificate;" and that its stock, property and affairs should be managed by a board of directors, a majority of whom in all cases should be stockholders therein and citizens of the State; and authorized the directors, subject to the revision and approval of the stockholders, to make such by-laws for the management and disposition of its stock and affairs, "and for carrying on all kinds of business within the objects and purposes of such company;"

and forbade the company to use any part of its capital stock or other funds in the purchase of stock in any other corporation. Penn. Stats. April 7, 1849, c. 368, §§ 1, 3, 4, 8; April 1, 1853, c. 186, § 2.

In accordance with the requirements of those statutes, the plaintiff's certificate of incorporation, or charter, stated the object for which it was formed, " the transportation of passengers in railroad cars constructed and to be owned by the said company in accordance with the several letters patent," four in all, described by numbers and dates; the place where, its chief operations were to be carried on, Philadelphia; 'the amount of its capital stock, $200,000; and its term of continuance, twenty years, the extreme limit allowed by the statutes.

By a special act of the legislature of Pennsylvania of February 9, 1870, c. 94, entitled " An act to extend the charter of the Central Transportation Company, to empower them to lease their property and increase their capital stock," the plaintiff's charter was extended for ninety-nine years from its expiration; and " said company are hereby empowered to enter into contracts with corporations of this· or any other State for the leasing or hiring and transfer to them, or any of them, of their railway cars and other personal property," as well as " to increase their present capital stock two hundred thousand dollars."

On February 17, 1870, eight days after the passage of that act, the indenture sued on was made by and between the plaintiff and the defendant, which had been incorporated three years before, with a capital stock of $100,000, by a special act of the legislature of Illinois of February 22, 1867, (declared to be a public act,) " to manufacture, construct and purchase railway cars, with all convenient appendages and supplies for persons travelling therein, and the same " to " sell or use, or permit to be used, in such manner and upon such terms as the said company may think fit and proper."

The indenture, after the statement of the names of the parties, began with the following recitals:

" Whereas the parties hereto are engaged in the business of manufacturing railway cars, generally known as sleeping cars,

under certain patents belonging to them respectively, and of hiring the same to railroad companies under written contracts, to be used and employed on and over the lines of the roads of said railroad companies, and receiving therefor income and revenue by the sale to passengers of the berths and accommodations therein; and

"Whereas the demands of the public for increased means of personal comfort and convenience in travelling, of avoiding repeated changes of cars over long routes of railroad, the necessity for affording, at fair and reasonable rates, these advantages, which cannot be extended by railroad companies themselves, require that every possible means should be adopted to meet such demands by avoiding the inconvenience and curtailing the expenses incidental to the maintenance of the business management and organization of two separate corporations."

It further recited that the parties (professing to act under the powers conferred upon them respectively by the special acts of the legislatures of Pennsylvania and of Illinois, above mentioned,) had agreed that the plaintiff should demise, transfer and set over to the defendant, and the defendant should take, all the plaintiff's railway cars, contracts, patent rights and personal property.

By that indenture, accordingly, the plaintiff "granted, demised, transferred and set over" one hundred and nineteen railway sleeping cars with their equipment, its contracts with sixteen railroad companies, (copies of which were annexed to and made parts of the indenture,) all its patent rights, (an assignment of which, including the four specified in its charter and thirteen others, was also annexed to the indenture and made part thereof,) and all its "personal property, rights, credits, moneys and effects, rights of action, money due and to become due from licenses heretofore granted," to the defendant, its successors and assigns, "to have and to hold the above demised property, and all income, revenue and profit to be derived therefrom," for the term of ninety-nine years from January 1, 1870, except so far as the contracts, patents and licenses should expire sooner; and the plaintiff expressly cove-

nanted that it would use its influence to obtain renewals or
new contracts in the defendant's name from the railroad com-
panies; and that it "shall and will not engage in the business
of manufacturing, using or hiring sleeping cars, while this
contract remains in full force and effect."

The defendant, on its part, covenanted to pay to the plain-
tiff annually the sum of $264,000, in equal quarterly instal-
ments, "during the entire term of ninety-nine years," unless,
upon a diminution of the revenue received from the railroad
companies, the indenture should be declared void by the
defendant, or the annual sums payable by the defendant be
reduced, as therein provided; also to pay all the plaintiff's
debts up to January 1, 1870, according to a schedule annexed,
by which they were not to exceed the sum of $63,998.69, that
being the amount of cash transferred by the plaintiff to the
defendant; to continue and carry on the business as authorized
by its charter, during the existence of the assigned contracts
or other like contracts with the same railroad companies; to
keep in repair the cars and their equipment, and to renew and
reconstruct them when needful; not to assign the indenture
without the plaintiff's assent, nor to create any lien or mort-
gage upon the property that should impair the plaintiff's
rights under the indenture; that, upon the defendant's failure
to make any quarterly payment for thirty days after due, the
plaintiff might avoid the indenture, and thereupon the defend-
ant should surrender the cars and equipment, assign to the
plaintiff the contracts with the railroad companies and any
unexpired patent rights, and cease to run or employ cars on
the same lines of railroad; and, at the end of the ninety-nine
years, to deliver to the plaintiff the cars and equipment in
good order, and assign to the plaintiff any unexpired contracts
with those railroad companies.

At the trial, in May, 1888, the plaintiff offered in evidence
its original charter, the statute of Pennsylvania of February
9, 1870, and the indenture of February 17, 1870; as well as
evidence tending to show that the defendant, under that indent-
ure, entered into possession of the plaintiff's property, and
continued in possession during the period covered by the dec-
laration.

To the admission of all this evidence the defendant objected, "on the ground that it was beyond the power of either corporation to make the contract; and also because it was null and void by reason of its being in restraint of trade and against public policy as preventing competition." The court sustained the objection, and excluded the evidence; and the plaintiff excepted.

The plaintiff then offered to prove, in addition to the above evidence, that in pursuance of the indenture of February 17, 1870, the plaintiff's cars, contracts and patent rights were delivered to the defendant, and continued in its possession under the indenture, and the defendant insisted on retaining them, until July 1, 1886, and the defendant then for the first time tendered them to the plaintiff and declared the indenture void, in accordance with its provisions. The defendant objected to this evidence; the court sustained the objection, and excluded the evidence; and the plaintiff excepted.

The defendant thereupon moved for a nonsuit, and the court granted the motion, and ordered a nonsuit, and refused a motion of the plaintiff to take it off; and the plaintiff again excepted. A judgment of nonsuit was entered accordingly; and the plaintiff tendered a bill of exceptions, which was allowed by the court, and sued out this writ of error.

*Mr. John G. Johnson* for plaintiff in error.

I. This contract was not *ultra vires.*

This case differs from *Thomas* v. *Railroad Company*, 101 U. S. 71; *Pennsylvania Railroad Co.* v. *St. Louis, Alton &c. Railroad Co.*, 118 U. S. 290, 307; and *Oregon Railway Co.* v. *Oregonian Railway Co.*, 130 U. S. 1, in that no privilege was conferred upon the Central Transportation Company, which required the performance of some duty as an equivalent. It never became a trustee for the public to discharge a duty because of a privilege conferred. It was vested with a franchise to be a corporation, to use a seal, and to act without its members becoming individually liable, saving to a certain extent, for its debts. It was permitted to do nothing which could not be done by an individual. Its sole power

was to manufacture cars under specified patents. It was in precisely the same position as that of a limited liability company, which is only permitted to do what may be done by individuals ; which is not a corporation; but which, under the laws of Pennsylvania, may use a common seal, and may act without its members being liable for its debts.

It does not require an act of Assembly to permit a railroad corporation to sell such of its real and personal property as is not necessary for the exercise of its franchises. None of the property acquired by a manufacturing company is necessary to the exercise of its power to manufacture; because it may locate other property at any point which may please it, and may there carry on its business. A railroad corporation, however, is only authorized to locate a road between certain termini. After it has located the same, its power further to locate is at an end. Its right of way, therefore, becomes absolutely necessary to the continuance of its railroad. There is, therefore, a very obvious reason for requiring that such property, so necessary to the exercise of the *quasi* public franchise, shall not be disposed of. There is no such reason in the case of a manufacturing corporation, which may build, or buy, as many mills as it may see fit.

The Central Transportation Company, though called a " transportation company," was, as we have said, a manufacturing corporation, with no right to transport, saving as the same resulted from its right to use the cars which it might manufacture. In selling or leasing such cars it exercised a right of ownership incidental to its right to manufacture, as much as was that to transport, and it violated no duty to the public such as it would have owed to it if it had acquired property under the right of eminent domain, or had been vested with a power to do some act for the public benefit, by legislative grant, which it was not competent for individuals to perform.

At the time of the lease the whole capital of the company had been invested in its cars, its patents and its contracts. Even if it was under an obligation to the State to manufacture, it had performed it by investing in such operation its

whole authorized capital. It was at liberty, after it had done this to sell the property, and it was under no obligation to reinvest the proceeds in further manufacturing.

Even if it had sold all its cars and patents, and had refused to manufacture other cars, and even if such refusal would have been cause for a forfeiture, it was only competent for the Commonwealth, by writ of *quo warranto*, to work such forfeiture. It is not open to any person other than the Commonwealth, to complain that a private corporation deserves a writ of ouster because of its non-exercise of its franchises. Of course, the case is different with a *quasi* public corporation; for there the public have a right to demand that the property which it has acquired under the right of eminent domain, shall be used for the benefit of those whose rights alone justified its grant. This right the court will make efficacious whenever a person in interest asks it so to do.

The distinction between *quasi* public, and ordinary trading corporations, is one that is much more than hinted at in *Thomas* v. *Railroad Company*, *supra*, and is very clearly stated in the text-books, and in many of the cases. Taylor on Private Corporations, §§ 131, 132; Morawetz on Corporations, §§ 1025, 1129; *Ardesco Oil Co.* v. *North American Mining Co.*, 66 Penn. St. 375, 381.

Further, the lease was not *ultra vires* in view of the act of February, 1870. This act antedates the lease by but a few days, and we may fairly infer that it was passed to set at rest any doubt which might possibly be raised as to the validity of what must then have been under contemplation. The lease, made within a few days after the passage of this act, has continued to be acted upon, without question as to its validity, for sixteen years. By virtue of this lease the Pullman Company has possessed itself of all the property and business of the plaintiff. If the decision of the court below is sustained, it will retain everything that is valuable, and which it could never have acquired but for this lease, and will be obliged to return nothing but worthless cars.

It was thought by the court below that the legislature could not have intended to permit this lease to be made, because it

extended the charter of the company for ninety-nine years, and permitted the capital to be increased. It was necessary to extend the charter, which would expire in some twelve years, in order that the corporation might make a lease of longer duration than would otherwise have been possible. The extension of the charter was even more necessary than was the giving of the power to lease and transfer. We can hardly suppose that the authority to increase the capital was conferred because the legislature intended to put upon the company the duty of manufacturing more cars. In point of fact, the capital stock was increased to permit the issue of a stock dividend. Though there is no evidence of this before this court, it can conceive of many reasons why the capital was permitted to be increased without supposing that such permission was meant as a denial of the expressly-conferred right to lease and transfer.

By the act of February, 1870, the company is "empowered to enter into contracts with corporations of this or any other State for the leasing, or hiring and transfer to them, or any of them, of their railway cars and other personal property."

Under another act of the same legislature, passed eight days later, to wit, on the seventeenth day of February, 1870, Purdon's Dig. 1441, all the leases of railroads in Pennsylvania have been made. The language of its grant was "to lease or become lessees of any railroad." This is no broader than the power conferred upon the Central Transportation Company. For the construction of similar acts see *Pennsylvania Railroad Company* v. *St. Louis, Alton &c. Railroad Co.*, 118 U. S. 290, 318; *Willamette M'f'g Co.* v. *Bank of British Columbia*, 119 U. S. 191.

It was not necessary to secure the passage of the act of February, 1870, to enable the plaintiff to hire its cars to railroad corporations. The right to use, or to hire to others to use, was incidental to that to manufacture. It had been hiring its cars to railroad corporations, as is evidenced by the contracts which it assigned to the Pullman Company, ever since it had been incorporated.

The act of 1870 conferred power to lease or hire and transfer all the cars and personal property of the plaintiff. Is it possible to confer in clearer language a more unlimited power to lease? To lease not a part, but the whole, of the assets of the company. Can we doubt that this act authorized the corporation to change its position from that of owner and possessor of its entire property into that of a lessor entitled to receive from its lessee a rental?

We can hardly believe that the decision of this court in *Railroad Co.* v. *Thomas* would have been rendered if an act of the legislature of New Jersey could have been found, approximating in liberality to the acts empowering the Central Transportation Company.

II. It did not create a monopoly, which made it void.

The Legislature of Pennsylvania authorized a lease of all the plaintiff's property to a single corporation, and, if, therefore, such a lease did create a monopoly, it was one which was legal. We do not, however, mean to confine our discussion under this head to saying this, although, as we think, it is conclusive.

It can hardly be said that a corporation having a power to manufacture cars creates a monopoly by selling or leasing such cars to another corporation, especially in a State like Pennsylvania, where it is open to any set of five persons in the Commonwealth, to file articles of association, and to become clothed with the power to manufacture as many cars as they may see fit.

In *Morrison* v. *Barclay Coal Company,* 68 Penn. St. 173, corporations which controlled, practically, all the output of coal in a large region, entered into a contract to put up prices. This did create a monopoly. It was impossible, however, for the Central Transportation Company to monopolize the manufacture of cars.

An assignment by the Central Transportation Company of the property which it possessed in 1870, created a monopoly to no greater extent than results from any assignment of a like character by a corporation or an individual. A monopoly results from a contract between persons or corporations prac-

tically controlling the supply of an article to restrict or inter-
fere with such supply.   A monopoly can never result from an
agreement between two persons or corporations, having no
possible power to control a supply, to consolidate their prop-
erty by a sale or lease from one to the other.

III. The lease was not void as contrary to public policy.
*Leather Cloth Co.* v. *Lonsont*, L. R. 9 Eq. 345; *Gibbs* v. *Balti-
more Gas Co.*, 130 U. S. 396, 409 ; *Oregon Steam Navigation
Co.* v. *Winsor*, 20 Wall. 64, 68 ; *Thomas* v. *Railroad Co.*, 101
U. S. 71, 83 ; *Fowle* v. *Park*, 131 U. S. 88 ; *Leslie* v. *Loril-
lard*, 110 N. Y. 519 ; *Morse Drill Co.* v. *Morse*, 103 Mass. 73 ;
*Davies* v. *Davies*, 36 Ch. D. 359 ; *Rousillon* v. *Rousillon*, 14
Ch. D. 351, 363 ; *Webster* v. *Buss*, 61 N. H. 40 ; *Hagg* v. *Dar-
ley*, 47 Law Journal (N. S.) Ch. 567 ; *Printing Co.* v. *Sampson*,
L. R. 19 Eq. 462; *McKinnon Pen Co.* v. *Fountain Ink Co.*,
48 N. Y. Supreme Ct. 442 ; *Baines* v. *Geary*, 35 Ch. D. 154.

In most of the cases reported, the relief which was refused
was to specifically enforce, or to recover damages for the
breach of, contracts by the party who by his covenant agreed
to restrain his future exertions.   In these, and in all other
cases, the court has struck down a covenant in unlimited re-
straint of trade without reason; because (1) of the right of
the covenantor to earn his livelihood, and (2) of the right of
the public to the exercise of his industry.

It is not necessary to protect the covenantor in a case like
the present, where its livelihood is provided for by the payment
of a very large rental during the whole term of the restriction.

Has the public a right in the continued conduct of its busi-
ness by a corporation, such as makes it illegal for it to agree
not to continue it ?   If it has, the remedy is by ouster, not by
confiscation in favor of the covenantee.

Corporations consist of an association of individuals who
contribute their capital for the furtherance of a common pur-
pose.   So far as these members are concerned, no covenant by
the corporation restricts their use of their individual capital in
any way it may please them.   The covenant by the corpora-
tion affects only the future use of the capital which has been
contributed to it.   Under the laws of Pennsylvania it may

dissolve at any time upon application to the court, without reason.   If it may dissolve, why may it not agree not to continue its business, where there is no duty upon it as the condition of a privilege of which it retains the benefit, without incurring any other risk than the possible action of the court upon a writ of *quo warranto?*   Certainly a corporation which is authorized to turn over by way of lease, and transfer to another corporation all its property, may agree that it will do nothing inconsistent with the lease which it is authorized to make, and thereafter it will remain under no obligation to the Commonwealth to contribute to the welfare of the community by a further investment of capital.   A legislative power to lease all the property of a corporation carries with it the right to do whatever will induce a person to become the lessee, especially to agree not to do what, if done, would render the lease worthless.

IV. The contract was so executed on the first day of July, 1886, as to entitle the plaintiff to sue for the rent which fell due up to that day, even if the contract was contrary to public policy.

In *Thomas* v. *Railroad Co., supra*, it was said : " It remains to consider the suggestion that the contract, having been executed, the doctrine of *ultra vires* is inapplicable to the case. There can be no question that, in many instances, where an invalid contract, which the party to it might have avoided or refused to perform, has been fully performed on both sides, whereby money has been paid or property changed hands, the courts have refused to sustain an action for the recovery of the property or the money so transferred.   In regard to corporations the rule has been well laid down by Comstock, C. J., in *Parrish* v. *Wheeler*, 22 N. Y. 494, that the executed dealings of corporations must be allowed to stand for and against both parties when the plainest rules of good faith require it.   But what is sought in the case before us is the enforcement of the unexecuted part of this agreement.   So far as it has been executed, namely, with four or five years of action under it, the accounts have been adjusted and each party has received what he was entitled to by its terms."

In *Oregon Railway and Navigation Co*. v. *Oregonian Company*, 130 U. S. 1, the suit was for a semi-annual rental, payable in advance, for a period which had only commenced to run after the property had been surrendered.

We have numerous cases in which it has been held that, after the contract has been executed, it is not competent for a corporation which has received the benefit of the execution to set up the defence of public policy, especially where it is not *ultra vires* for the corporation which sets up the defence to pay. *Woodruff* v. *Erie Railway*, 93 N. Y. 609; *Camden and Atlantic Railroad* v. *May's Landing Railroad*, 48 N. J. Law, 530; *Railway Co.* v. *McCarthy*, 96 U. S. 258, 267; *San Antonio* v. *Mehaffy*, 96 U. S. 312, 315; *Oil Creek Railroad* v. *Pennsylvania Transportation Co.*, 83 Penn. St. 160; *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62.

In the present case the suit is not for damages for an unexecuted contract, but to recover the consideration agreed to be paid for a lease of property which ended on the first day of July, 1886. If the contention of the defendant that it had a right then to terminate the lease was well founded, nothing more remained to be done by either party. It is impossible to see that the defendant lost anything by reason of the nonenforcible character, if it had such a character, of the covenant not to manufacture other cars; because after the first day of July, 1886, the plaintiff was at liberty to do what it pleased.

Until that day the Pullman Company had retained possession of all the plaintiff's property. Why was it not obliged to pay what it had agreed to pay for a consideration which was then fully performed? Why ought not that company which agreed to pay a certain sum that it had the legal right to agree to pay, be estopped from setting up against the plaintiff, which may not have had the right to covenant that it would not engage in the business of manufacturing cars, but which had not engaged in that business, and whose property had been used, the fact that it had made an illegal contract to do something which in fact it had not done? How will public policy be promoted by permitting the defendant, which has received the consideration for the contract, to ignore the compensation it agreed to pay?

The contract, so far as concerned the covenant to pay rent up to the first of July, 1886, had been fully executed by the plaintiff. The learned judge below thought that because it had no right to bind itself not to engage in the business of manufacturing cars it ought not to recover the full rental stipulated for. To this we reply that up to the first day of July, 1886, the defendant had received the full consideration for the agreed-upon rental which it had bound itself to pay quarterly.

If the learned judge, however, was right in his theory, he forgot that on the first day of July, 1886, the defendant had tendered to the plaintiff its property and had announced the lease as ended. It was not entitled, after the termination of the lease, to object to their right because of the non-enforcibility. There should have been no allowance to it of a deduction because of this covenant, when it had never been broken and when the right to insist upon it had terminated by expiration of time.

We urge, however, beyond this, that the rental was agreed to be paid as a consideration for the delivery of certain patents, contracts and cars. The duty to pay rent from quarter to quarter resulted from the fact of such delivery. If the superadded and separate covenant by the plaintiff not to engage in the business of manufacturing cars could not be enforced, it was because of a matter of law which both parties were bound to know. Did the fact that an additional covenant was entered into, which was not legally enforcible, release the defendant from its obligation to pay the rental it had agreed to pay as a consideration for what it got? *Oregon Navigation Co.* v. *Winsor*, 20 Wall. 64; *Wallace* v. *Day*, 2 M. & W. 273.

In conclusion, we urge upon the court that the decision of the court below leaves the plaintiff in a most deplorable condition. Its contracts, which were valuable, are gone. The defendant under the lease is now in possession of all the contracts which were formerly owned by the plaintiff. It has been denied a right to recover the sum agreed to be paid in the lease because of the contract being against public policy.

If it cannot recover upon the contract, how can it recover upon a *quantum meruit?* If it has no action at law, how can it obtain any relief in equity?

*Mr. Edward S. Isham* and *Mr. Wayne MacVeagh* for defendant in error.

MR. JUSTICE GRAY, after stating the case as above, delivered the opinion of the court.

The principal defence in this case, duly made by the defendant, by formal plea, as well as by objection to the plaintiff's evidence, and sustained by the Circuit Court, was that the indenture of lease sued on was void in law, because beyond the powers of each of the corporations by and between whom it was made.

There is a preliminary question of practice, arising out of the manner in which the case was disposed of below, which is deserving of notice, although not mentioned by counsel in argument.

The Circuit Court, in ordering a nonsuit because in its opinion the evidence offered by the plaintiff was insufficient in law to maintain the action, acted in accordance with the statute of Pennsylvania, which provides that "it shall be lawful for the judge presiding at the trial to order a judgment of nonsuit to be entered, if in his opinion the plaintiff shall have given no such evidence as in law is sufficient to maintain the action, with leave, nevertheless, to move the court *in banc* to set aside such judgment of nonsuit; and in case the said court, *in banc* shall refuse to set aside the nonsuit, the plaintiff may remove the record by writ of error into the Supreme Court for revision and review, in like manner and with like effect as he might remove a judgment rendered against him upon a demurrer to evidence." Penn. Stats. March 11, 1836, c. 34, § 7; March 11, 1875, c. 8; 2 Purdon's Digest (11th ed.) 1362, 1363.

Under that statute, as expounded by Chief Justice Gibson, the judge can order a nonsuit, only when all the evidence introduced, with every inference of fact that a jury might draw from it in favor of the plaintiff, appears to be insufficient

in matter of law to sustain a verdict; and the defendant's motion for a nonsuit is equivalent to a demurrer to evidence, differing only in the judgment thereon not being a final determination of the rights of the parties, for if it is in favor of the plaintiff the case must be submitted to the jury, and if in favor of the defendant it is no bar to a new action. *Smyth* v. *Craig,* 3 Watts & Sergeant, 14; *Fleming* v. *Insurance Co.,* Brightly, 102; *Bournonville* v. *Goodall,* 10 Penn. St. 133.

It is true that a plaintiff, who appears by the record to have voluntarily become nonsuit, cannot sue out a writ of error. *United States* v. *Evans,* 5 Cranch, 280; *Evans* v. *Phillips,* 4 Wheat. 73; *Cossar* v. *Reed,* 17 Q. B. 540. But in the case of a compulsory nonsuit it is otherwise; and a plaintiff, against whom a judgment of nonsuit has been rendered without his consent and against his objection, is entitled to relief by writ of error. *Elmore* v. *Grymes,* 1 Pet. 469; *Strother* v. *Hutchinson,* 4 Bing. N. C. 83; *S. C.* 5 Scott, 346; 6 Dowling, 238; *Voorhees* v. *Coombs,* 4 Vroom, 482.

There are many cases in the books, in which this court has held that a court of the United States had no power to order a nonsuit without the plaintiff's acquiescence. *Elmore* v. *Grymes,* above cited; *Crane* v. *Morris,* 6 Pet. 598, 609; *Silsby* v. *Foote,* 14 How. 218; *Castle* v. *Bullard,* 23 How. 172, 183. Yet, instead of overruling, upon that ground alone, exceptions to a refusal to order a nonsuit, this court, more than once, has considered and determined questions of law upon the decision of which the nonsuit was refused in the court below. *Crane* v. *Morris* and *Castle* v. *Bullard,* above cited.

The difference between a motion to order a nonsuit of the plaintiff and a motion to direct a verdict for the defendant is, as observed by Mr. Justice Field, delivering a recent opinion of this court, "rather a matter of form than of substance, except [that] in the case of a nonsuit a new action may be brought, whereas in the case of a verdict the action is ended, unless a new trial be granted, either upon motion or upon appeal." *Oscanyan* v. *Arms Co.,* 103 U. S. 261, 264.

Whether a defendant in an action at law may present in the one form or in the other, or by demurrer to the evidence,

the defence that the plaintiff, upon his own case, shows no cause of action, is a question of "practice, pleadings, and forms and modes of proceeding," as to which the courts of the United States are now required by the act of Congress of June 1, 1872, c. 255, § 5, (17 Stat. 197,) reënacted in § 914 of the Revised Statutes, to conform, as near as may be, to those existing in the courts of the State within which the trial is had. *Sawin* v. *Kenny*, 93 U. S. 289 ; *Ex parte Boyd*, 105 U. S. 647 ; *Chateaugay Co., petitioner*, 128 U. S. 544 ; *Glenn* v. *Sumner*, 132 U. S. 152, 156.

It is doubtless within the authority of the presiding judge, and is often more convenient, in order to prevent the case from being brought up in such a form that the judgment of the court of last resort will not finally determine the rights of the parties, to adopt the course of directing a verdict for the defendant and entering judgment thereon.

But the judgment of nonsuit, being a final judgment disposing of the particular case, and rendered upon a ruling in matter of law duly excepted to by the plaintiff, is subject to be reviewed in this court by writ of error.

It was therefore rightly assumed by the counsel of both parties at the argument that the only question to be determined is of the correctness of the ruling sustaining the defence of *ultra vires*, independently of the form in which that question was presented and disposed of.

Upon the authority and the duty of a corporation to exercise the powers granted to it by the legislature, and those only ; and upon the invalidity of any contract, made beyond those powers, or providing for their disuse or alienation ; there is no occasion to refer to decisions of other courts, because the judgments of this court, especially those delivered within the last twelve years by the late Mr. Justice Miller, afford satisfactory guides and ample illustrations.

The earliest case in this court, which touches the subject, is *York & Maryland Railroad* v. *Winans*, decided at December term, 1854, in which a railroad corporation unsuccessfully tried to escape liability for an unlicensed use of the plaintiff's patent in cars run over its road, upon the ground that the cars were

constructed, owned and used by another corporation under a contract with the defendant. Mr. Justice Campbell delivering judgment said : "Important franchises were conferred upon the corporation to enable it to provide the facilities to communication and intercourse, required for the public convenience. Corporate management and control over these were prescribed, and corporate responsibility for their insufficiency provided, as a remuneration to the community for their grant. The corporation cannot absolve itself from the performance of its obligations, without the consent of the legislature." 17 How. 30, 39.

In *Pearce* v. *Madison & Indianapolis Railroad*, at December term, 1858, it was adjudged that two corporations, chartered by the State of Indiana to construct and manage distinct, though connecting railroads, had no power to consolidate themselves into one corporation, or to establish a connecting steamboat line on the Ohio River, and therefore were not liable to be sued upon a promissory note which they had given in payment for a steamboat. The same justice, in delivering the opinion of the court, stated the reasons for the decision as follows: "The rights, duties and obligations of the defendants are defined in the acts of the legislature of Indiana under which they were organized, and reference must be had to these, to ascertain the validity of their contracts. They empower the defendants respectively to do all that was necessary to construct and put in operation a railroad between the cities which are named in the acts of incorporation. There was no authority of law to consolidate these corporations, and to place both under the same management, or to subject the capital of the one to answer for the liabilities of the other ; and so the courts of Indiana have determined. But, in addition to that act of illegality, the managers of these corporations established a steamboat line to run in connection with the railroads, and thereby diverted their capital from the objects contemplated by their charters, and exposed it to perils for which they afforded no sanction. Now, persons dealing with the managers of a corporation must take notice of the limitations imposed upon their authority by the act of incorporation. Their

powers are conceded in' consideration of the advantage the
public is to receive from their discreet and intelligent employ-
ment, and the public have an interest that neither the mana-
gers nor stockholders of the corporations shall transcend their
authority." 21 How. 441–443.

In *Zabriskie* v. *Cleveland, &c. Railroad*, at December term,
1859, this court, again speaking by the same justice, while
affirming and acting on the principle that a corporation may
be bound by the conduct and representations of its directors
in "those cases in which a corporation acts within the range
of its general authority, but fails to comply with some for-
mality or regulation which it should not have neglected, but
which it has chosen to disregard," took the precaution to ob-
serve: "This principle does not impugn the doctrine that a
corporation cannot vary from the object of its creation, and
that persons dealing with a company must, take notice of
whatever is contained in the law of their organization. This
doctrine has been constantly affirmed in this court." 23 How.
381, 398.

In *Thomas* v. *Railroad Co.*, 101 U. S. 71, decided at October
term, 1879, it was adjudged that a lease for twenty years by a
railroad corporation of its railroad, rolling stock and franchises,
in consideration of being paid one half of the gross sums
collected from the operation of the road by the lessees during
the term, and reserving to the lessor a right to terminate the
lease and retake possession of the road at any time, paying to
the lessees the value of the unexpired term, was void; and
that the corporation, upon terminating the lease and resuming
possession when the lessees had been in possession five years,
and the accounts of the parties for those years having been
adjusted and paid, was not liable to an action by the lessees to
recover the value of the unexpired term; and Mr. Justice
Miller, in the course of delivering judgment, said:

"The authority to make this lease is placed by counsel pri-
marily in the following language of the thirteenth section of
the company's charter: 'That it shall be lawful for the said
company, at any time during the continuance of its charter,
to make contracts and engagements with any other corpora-

tion, or with individuals, for the transporting or conveying any kinds of goods, produce, merchandise, freight or passengers, and to enforce the fulfilment of such contracts.' This is no more than saying ' you may do the business of carrying goods and passengers, and may make contracts for doing that business. Such contracts you may make with any other corporation or with individuals.' No doubt a contract by which the goods, received from railroad or other carrying companies, should be carried over the road of this company, or by which goods or passengers from this road should be carried by other railroads, whether connecting immediately with them or not, are within this power, and are probably the main object of the clause. But it is impossible, under any sound rule of construction, to find in the language used a permission to sell, lease or transfer to others the entire road, and the rights and franchises of the corporation. To do so is to deprive the company of the power of making those contracts which this clause confers, and of performing the duties which it implies." 101 U. S. 80. "The authority to build a railroad and to contract for carrying passengers and goods over it and other roads is no authority to lease it, and with the lease to part with all its powers to another company or to individuals." 101 U. S. 81.

"The powers of corporations organized under legislative statutes are such, and such only, as those statutes confer. Conceding the rule applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains, that the charter of a corporation is the measure of its powers, and that the enumeration of these powers implies the exclusion of all others." 101 U. S. 82.

"There is another principle of equal importance, and equally conclusive against the validity of this contract, which, if not coming exactly within the doctrine of *ultra vires* as we have just discussed it, shows very clearly that the railroad company was without the power to make such a contract. That principle is, that where a corporation, like a railroad company, has granted to it by charter a franchise intended in large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant,

any contract which disables the corporation from performing those functions, which undertakes, without the consent of the State, to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes, is a violation of the contract with the State, and is void as against public policy." 101 U. S. 83.

It was also held in that case that the lease was not made valid by a subsequent act of the legislature, regulating the rates of fares and freights to be charged by "the directors, lessees or agents of said railroad;" the court saying: "It is not by such an incidental use of the word 'lessees' in an effort to make sure that all who collected fares should be bound by the law, that a contract unauthorized by the charter, and forbidden by public policy, is to be made valid and ratified by the State." 101 U. S. 85.

In *Branch* v. *Jesup*, Mr. Justice Bradley delivering judgment said: "Generally the power to sell and dispose has reference only to transactions in the ordinary course of business incident to a railroad company; and does not extend to the sale of the railroad itself, or of the franchises connected therewith. Outlying lands, not needed for railroad uses, may be sold. Machinery and other personal property may be sold. But the road and franchises are generally inalienable; and they are so, not only because they are acquired by legislative grant, or in the exercise of special authority given, for the specific purposes of the incorporating act, but because they are essential to the fulfilment of those purposes; and it would be a dereliction of the duty owed by the corporation to the State and to the public to part with them." And a lease from one railroad corporation to another was upheld in that case, only because the lessor had by its charter express authority, not only to purchase, hold and convey property, real and personal, and to connect its road with any other road, but also to incorporate its stock with that of any other company, which, it was observed, "contemplates not only the possible transfer of the railroad and its franchises to another company, but even the extinguishment of the corporation itself, and its absorption into a different organization. The greater power

of alienating or extinguishing all its franchises, including its own being and existence, contains the lesser power of alienating its road and the franchises incident thereto and necessary to its operation.    Its power of alienation and sale extends to a class of subjects to which it does not ordinarily apply."    106 U. S. 468, 478, 479.

In *Pennsylvania Railroad* v. *St. Louis &c. Railroad,* the same principles were reaffirmed; and the court, again speaking by Mr. Justice Miller, after referring to some of the previous decisions on the subject in this and other courts, stated, "as the just result of these cases and on sound principle, that unless specially authorized by its charter, or aided by some other legislative action, a railroad company cannot, by lease or any other contract, turn over to another company, for a long period of time, its road and all its appurtenances, the use of its franchises and the exercise of its powers; nor can any other railroad company without similar authority make a contract to receive and operate such road, franchises and property of the first corporation; and that such a contract is not among the ordinary powers of a railroad company, and is not to be presumed from the usual grant of powers in a railroad charter."

In that case it was held that a lease for ninety-nine years of a railroad in Illinois and Indiana from a railroad corporation of Illinois to a railroad corporation of Indiana, whose road connected with the road leased, was within the authority conferred on the lessor by the statute of Illinois, which empowered all railroad corporations of that State to make "contracts and arrangements with each other, and with railroad corporations of other States, for leasing or running their roads, or any part thereof;" yet was unlawful and void, because beyond the authority conferred upon the lessee by the statute of Indiana, empowering any railroad corporation of that State, whose road connected with a railroad in an adjoining State, "to make such contracts and agreements with any such road constructed in an adjoining State, for the transportation of freight and passengers, or for the use of its said road, as to the board of directors may seem proper;" the court saying that it could not "see in this provision any authority to make

contracts beyond those which relate to forwarding by one company the passengers and freight of another, on terms to be agreed on, and possibly for the use of the road of one company in running the cars of the other over it to its destination without breaking bulk." 118 U. S. 290, 309, 312, 630.

In another case, decided about the same time, the same justice, in delivering an opinion by which a corporation was held to be liable for a tort done by its agents in the course of its business and of their employment, although in excess of its ·powers, observed: " The question of the liability of corporations on contracts which the law does not authorize them to make, and which are wholly beyond the scope of their powers, is governed by a different principle. Here the party dealing with the corporation is under no obligation to enter· into the contract. No force, or restraint, or fraud is practised on him. The powers of these corporations are matters of public law open to his examination, and he may. and must judge for himself as to the power of the corporation to bind itself by the proposed agreement." *Salt Lake City* v. *Hollister*, 118 U. S. 256, 263.

In *Willamette Co.* v. *Bank of British Columbia*, 119 U. S. 191, cited for the plaintiff, a corporation chartered "for the purpose of creating and improving water power and privileges," and authorized to bring water from a river, was also expressly authorized by its charter to " use, rent or sell " " the exclusive right to the hydraulic power and privileges created by the water " so taken, and for that reason only was held by this court, speaking by the same justice, to have the power to mortgage such right, power and privileges.

In *Green Bay & Minnesota Railroad* v. *Union Steamboat Co.*, 107 U. S. 98, and in *Pittsburgh &c. Railway* v. *Keokuk & Hamilton Bridge*, 131 U. S. 371, 384, the general doctrine of *ultra vires*, as established by earlier decisions, was affirmed; and a railroad corporation was held to have the power, for the purpose of securing a continuous line of transportation of which its road formed part, to make a contract with a steamboat- company, or with a company chartered to construct a railway bridge or viaduct, because the charter· of the particular

railroad corporation, read in connection with the general laws applicable to it, clearly manifested the intention of the legislature to confer upon it that power.

In *Oregon Railway* v. *Oregonian Railway*, 130 U. S. 1, it was held that a general law of Oregon, authorizing companies to organize themselves by written articles of association filed with the Secretary of State for "any lawful enterprise, business, pursuit or occupation" specified in the articles, including "making or constructing any railroad," and "to purchase, possess and dispose of such real and personal property as may be necessary and convenient to carry into effect the object of the incorporation," did not authorize a railroad corporation to be incorporated, either for leasing its railroad to another corporation, or for taking leases from other corporations of their roads, although these objects were included in its articles of association; and therefore that, without further and express authority from the legislature, a lease for ninety-six years from one railroad corporation of its whole road and franchises to another such corporation was utterly void, and would not sustain an action by the lessor against the lessee to recover the rent stipulated in the lease.

It was also held in that case, in accordance with the decision in *Thomas* v. *Railroad Co.*, that no authority to make such a lease could be implied from a special act passed by the Oregon legislature before the lease, granting to the plaintiff corporation rights, privileges and easements, for wharves, stations and tracks, in certain public grounds and streets; with a proviso that said corporation "or its assigns" should have no power to sell, convey or assign the rights so granted to any person or corporation, save only with and as part of its railway; and the reasons for so holding appear in the following extracts from the opinion of the court, delivered by Mr. Justice Miller:

"One of the most important powers with which a corporation can be invested is the right to sell out its whole property together with the franchises under which it is operated, or the authority to lease its property for a long term of years. In the case of a railroad company, these privileges, next to the right to build and operate its railroad, would be the most

important which could be given it, and this idea would impress itself upon the legislature. Naturally, we would look for the authority to do these things in some express provision of law. We would suppose that if the legislature saw fit to confer such rights, it would do so in terms which could not be misunderstood. To infer, on the contrary, that it either intended to confer them or to recognize that they already existed, by the simple use of the word ' assigns,' a very loose and indefinite term, is a stretch of the power of the court in making implications which we do not feel to be justified." 130 U. S. 30.

" The object of the legislature in making the proviso to that statute was to make sure that the grant given to the Oregonian Company of terminal facilities, as they are called, with the right to wharves, depots and access to the river for the use of the road, should never be separated by sale, assignment or otherwise from the road itself, and that into whosesoever hands the road went should also go the rights, powers and privileges conveyed by the grant." 130 U. S. 32.

It was further held that a provision of the general laws of Oregon, authorizing any corporation, by a vote of a majority of its stockholders, to dissolve itself, and thereupon to settle its business, dispose of its property and divide its capital stock, did not confer upon it any authority, while continuing in existence, to dispose of by conveyance or lease its road and its corporate powers and franchises. 130 U. S. 34, 35.

The clear result of these decisions may be summed up thus : The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental. All contracts made by a corporation beyond the scope of those powers are unlawful and void, and no action can be maintained upon them in the courts, and this upon three distinct grounds : the obligation of every one contracting with a corporation, to take notice of the legal limits of its powers; the interest of the stockholders, not to be subjected to risks which they have never undertaken ; and, above all, the interest of the public, that the corporation shall not transcend the powers conferred upon it by law. A cor-

poration cannot, without the assent of the legislature, transfer its franchise to another corporation, and abnegate the performance of the duties to the public, imposed upon it by its charter as the consideration for the grant of its franchise. Neither the grant of a franchise to transport passengers, nor a general authority to sell and dispose of property, empowers the grantee, while it continues to exist as a corporation, to sell or to lease its entire property and franchise to another corporation. These principles apply equally to companies incorporated by special charter from the legislature, and to those formed by articles of association under general laws.

By a familiar rule, every public grant of property, or of privileges or franchises, if ambiguous, is to be construed against the grantee and in favor of the public; because an intention, on the part of the government, to grant to private persons, or to a particular corporation, property or rights in which the whole public is interested, cannot be presumed, unless unequivocally expressed or necessarily to be implied in the terms of the grant; and because the grant is supposed to be made at the solicitation of the grantee, and to be drawn up by him or by his agents, and therefore the words used are to be treated as those of the grantee; and this rule of construction is a wholesome safeguard of the interests of the public against any attempt of the grantee, by the insertion of ambiguous language, to take what could not be obtained in clear and express terms. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 544–548; *Dubuque & Pacific Railroad* v. *Litchfield*, 23 How. 66, 88, 89; *Slidell* v. *Grandjean*, 111 U. S. 412, 437, 438. This rule applies with peculiar force to articles of association, which are framed under general laws, and which are a substitute for a legislative charter, and assume and define the powers of the corporation by the mere act of the associates, without any supervision of the legislature or of any public authority. *Oregon Railway* v. *Oregonian Railway*, 130 U. S. 26, 27.

In the case at bar, the plaintiff was originally incorporated for twenty years from December 26, 1862, with a capital stock of $200,000, by articles of association, called a certificate or

charter, under general laws of Pennsylvania. It is not without significance, that those laws required its stock, property and affairs to be managed by a board of directors, a majority of whom should be stockholders therein, and citizens of the State; and forbade it to use any part of its capital stock in the purchase of stock in any other corporation. Those laws related to manufacturing companies only. But the purpose of its incorporation, as stated in that charter, was " the transportation of passengers in railroad cars constructed and to be owned by the said company " under certain patents. And, as appears by the recitals in the indenture sued on, the plaintiff carried on the business of manufacturing sleeping cars under its patents, and of hiring or letting those cars to railroad companies by written contracts, receiving a revenue from the sale of berths and accommodations to passengers.

The validity of the plaintiff's incorporation, as well as its power to make that indenture, however, depends not solely upon the original charter and the general laws under which it came into existence, but mainly upon a special act of the legislature of Pennsylvania of February 9, 1870. By this act, the validity of the charter for the object therein named was clearly recognized; the charter was extended for ninety-nine years, nearly fivefold the period for which the corporation was or could have been formed under general laws; and the corporation was expressly empowered to double its capital stock, and "to enter into contracts with corporations of this or any other State for the leasing or hiring and transfer to them, or any of them," of its " railway cars and other personal property."

The plaintiff, therefore, was not an ordinary manufacturing corporation, such as might, like a partnership or an individual engaged in manufactures, sell or lease all its property to another corporation. *Ardesco Oil Co.* v. *North American Oil Co.*, 66 Penn. St. 375; *Treadwell* v. *Salisbury Manuf. Co.*, 7 Gray, 393. But the purpose of its incorporation, as defined in its charter, and recognized and confirmed by the legislature, being the transportation of passengers, the plaintiff exercised a public employment, and was charged with the

duty of accommodating the public in the line of that employment, exactly corresponding to the duty which a railroad corporation or a steamboat company, as a carrier of passengers, owes to the public, independently of possessing any right of eminent domain.   The public nature of that duty was not affected by the fact that it was to be performed by means of cars constructed and of patent rights owned by the corporation, and over roads owned by others.   The plaintiff was not a strictly private, but a *quasi* public corporation; and it must be so treated as regards the validity of any attempt on its part to absolve itself from the performance of those duties to the public, the performance of which by the corporation itself was the remuneration that it was required by law to make to the public in return for the grant of its franchise.   *Pickard* v. *Pullman Southern Car Co.*, 117 U. S. 34; *York & Maryland Railroad* v. *Winans*, 17 How. 30, 39; *Railroad Co.* v. *Lockwood*, 17 Wall. 357; *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397.

The evident purpose of the legislature, in passing the statute of 1870, was to enable the plaintiff the better to perform its duties to the public, by prolonging its existence, doubling its capital, and confirming, if not enlarging, its powers.   An intention that it should immediately abdicate those powers, and cease to perform those duties, is so inconsistent with that purpose, that it cannot be implied, without much clearer expressions of the legislative will looking towards that end, than are to be found in this statute.

The provision of this statute, by which the plaintiff is empowered to contract with other corporations " for the leasing or hiring and transfer to them, or any of them," of its " railway cars and other personal property," is fully satisfied by construing it as confirming the plaintiff's right to do as it had been doing, to " lease " or " hire " (which are equivalent words) to other corporations in the regular course of its business, and to " transfer " under such leasing or hiring, its " railway cars," and " other personal property," either connected with the cars, or at least of the same general nature of tangible property.   It can hardly be stretched to warrant the

plaintiff in making to a single corporation an absolute trans-
fer, or a long lease, of all that might be comprehended in the
words "personal property" in their widest sense, including
not only goods and chattels, but moneys, credits and rights of
action.  In any view, it would be inconsistent alike with the
main purpose of the statute, and with the uniform course of
decision in this court, to construe these words as authorizing
the plaintiff to deprive itself, either absolutely, or for a long
period of time, of the right to exercise the franchise granted
to it by the legislature for the accommodation of the public.

By the contract between these parties, as expressed in the
indenture sued on, are transferred all cars already constructed,
all existing contracts with railroad companies for running cars,
all existing patent rights under which other cars might be
constructed, and all other personal property, moneys, credits
and rights of action of the plaintiff.  But after the cars and
the railroad contracts may have ceased to exist, and after all
those patent rights must have expired, the indenture is still to
continue in force for the full term of ninety-nine years, unless
sooner terminated as therein provided.  In addition to all this,
the plaintiff covenants, in the most express and positive terms,
never to "engage in the business of manufacturing, using or
hiring sleeping cars" while the indenture remains in force.  In
short, the plaintiff not only parts with all its means of carry-
ing on the business, and of performing the duty, for which it
had been chartered, of transporting passengers and making
and letting cars to transport them in; but it undertakes to
transfer, for ninety-nine years, nearly coextensive with the
duration of its own corporate existence, the whole conduct of
its business, and the performance of all its public duties, to
another corporation ; and to continue in existence, during that
period, for no other purpose than that of receiving, from time
to time, from the other corporation, the stipulated rent or com-
pensation, and of making dividends out of the moneys so
received.

Considering the long term of the indenture, the perishable
nature of the property transferred, the large sums to be paid
quarterly by the defendant by way of compensation, its as-

sumption of the plaintiff's debts, and the frank avowal, in the indenture itself, of the intention of the two corporations to prevent competition and to create a monopoly, there can be no doubt that the chief consideration for the sums to be paid by the defendant was the plaintiff's covenant not to engage in the business of manufacturing, using or hiring sleeping cars; and that the real purpose of the transaction was, under the guise of a lease of personal property, to transfer to the defendant nearly the whole corporate franchise of the plaintiff, and to continue the plaintiff's existence for the single purpose of receiving compensation for not performing its duties.

The necessary conclusion from these premises is, that the contract sued on was unlawful and void, because it was beyond the powers conferred upon the plaintiff by the legislature, and because it involved an abandonment by the plaintiff of its duty to the public.

There is strong ground, also, for holding that the contract between the parties is void, because in unreasonable restraint of trade, and therefore contrary to public policy. Of the cases cited by the plaintiff upon this point, those which have most resemblance to the present case are quite distinguishable.

A covenant by the assignor of letters patent for an invention, that he will not himself make, use or sell the patented article, is undoubtedly valid, because the act of Congress which creates the monopoly expressly authorizes it to be assigned as a whole. Rev. Stat. §§ 4884, 4898; *Gayler* v. *Wilder*, 10 How. 477, 494; *Morse Co.* v. *Morse*, 103 Mass. 73. But this plaintiff's transfer and covenant, as we have seen, cover much more than patent rights, and are to continue in force long after the patent rights assigned must have expired.

Upon the sale of a secret process, a covenant, express or implied, that the seller will not use the process himself or communicate it to any other person, is lawful, because the process must be kept secret in order to be of any value, and the public has no interest in the question by whom it is used. *Fowle* v. *Park*, 131 U. S. 88, 97; *Vickery* v. *Welch*, 19 Pick. 523, 527; *Peabody* v. *Norfolk*, 98 Mass. 452, 460.

A contract of a carrier, whether an individual or a corpora-

tion, not to carry passengers or goods over a particular route, may be reasonable and valid. *Peirce* v. *Fuller*, 8 Mass. 223; *Palmer* v. *Stebbins*, 3 Pick. 188; *Leslie* v. *Lorillard*, 110 N. Y. 519. But a contract by which a corporation, chartered to perform the duties of a common carrier, or any other duties to the public, agrees that it will not perform those duties at all, anywhere, for ninety-nine years, is clearly unreasonable and void. *Oregon Steam Navigation Co.* v. *Winsor*, 20 Wall. 64; *Gibbs* v. *Baltimore Gas Co.* 130 U. S. 396, 408–410.

This case strikingly illustrates several of the obvious considerations for holding contracts in restraint of trade to be unreasonable and void, as compactly and forcibly stated by Mr. Justice Morton in the leading case of *Alger* v. *Thacher:* "They tend to deprive the public of the services of men in the employments and capacities in which they may be most useful to the community as well as themselves." "They prevent competition and enhance prices." "They expose the public to all the evils of monopoly. And this especially is applicable to wealthy companies and large corporations, who have the means, unless restrained by law, to exclude rivalry, monopolize business and engross the market." 19 Pick. 51, 54.

But this objection, as applied to the facts of this case, so closely connects itself with the objection more distinctly pleaded, and already discussed at length, that it requires no further separate consideration.

The contract sued on being clearly beyond the powers of the plaintiff corporation, it is unnecessary to determine whether it is also *ultra vires* of the defendant, because, in order to bind either party, it must be within the corporate powers of both. *Thomas* v. *Railroad Co.*, *Pennsylvania Railroad* v. *St. Louis &c. Railroad*, and *Oregon Railway* v. *Oregonian Railway*, above cited.

It was argued in behalf of the plaintiff that, even if the contract sued on was void, because *ultra vires* and against public policy, yet that, having been fully performed on the part of the plaintiff, and the benefits of it received by the defendant, for the period covered by the declaration, the defendant was estopped to set up the invalidity of the contract as a defence

to this action to recover the compensation agreed on for that period.

But this argument, though sustained by decisions in some of the states, finds no support in the judgments of this court.

The passages cited by the plaintiff from *Railway Co.* v. *McCarthy*, 96 U. S. 258, 267, and *San Antonio* v. *Mehaffy*, 96 U. S. 312, 315, are no more than a passing remark that "the doctrine of *ultra vires*, when invoked for or against a corporation, should not be allowed to prevail when it would defeat the ends of justice or work a legal wrong," and a repetition, in substance, of the same remark, adding "if such a result can be avoided."

In *Thomas* v. *Railroad Co.*, already cited, Mr. Justice Miller, while admitting in general terms that "in many instances, where an invalid contract, which the party to it might have avoided or refused to perform, has been fully performed on both sides, whereby money has been paid or property changed hands, the courts have refused to sustain an action for the property or the money so transferred," and that "the executed dealings of corporations must be allowed to stand for and against both parties when the plainest rules of good faith require it," yet in the same connection, and in the most emphatic words, said that in the case before the court, of a contract forbidden by public policy and beyond the powers of the defendant corporation, it was its legal duty, a duty both to its stockholders and to the public, to rescind and abandon the contract at the earliest moment, and the performance of that duty, though delayed for several years, was a rightful act when done, and could give the other party no right of action; and that to hold otherwise would be "to hold that any act performed in executing a void contract makes all its parts valid, and that the more that is done under a contract forbidden by law, the stronger is the claim to its enforcement by the courts." 101 U. S. 86.

In an earlier part of the same opinion, and again in *Oregon Railway* v. *Oregonian Railway*, he referred with approval to the decision of the House of Lords in *Ashbury Railway Carriage & Iron Co.* v. *Riche*, L. R. 7 H. L. 653, by which, as he

observed, "the broad doctrine was established that a contract not within the scope of the powers conferred on the corporation cannot be made valid by the assent of every one of the shareholders, nor can it by any partial performance become the foundation of a right of action." 101 U. S. 83; 130 U. S. 22.

In *Union Trust Co.* v. *Illinois Midland Co.*, 117 U. S. 434, after one railroad corporation had purchased of two others their connecting railroads and their franchises, a receiver had been appointed of all its property, including the three railroads, and, under the direction of the court, and without objection by any of the parties interested, had for years administered the whole as a unit, and incurred expenses and issued certificates accordingly. It was held that the holders of bonds secured by mortgage of one of the purchased railroads could not, for want of affirmative legislative authority for the sale and purchase of that road, claim a priority of lien upon it as against the holders of certificates issued by the receiver for necessary and proper expenses of the whole line; and this court, as declared in its opinion delivered by Mr. Justice Blatchford, rested this conclusion "on the principle that nonaction on the part of the bondholders and their trustee, which allowed the court and the receivers to go on during the entire litigation, contracting debts in respect to the whole line operated as a unit, and administering the property as one, under circumstances where, as shown, it was and is impossible to separate the interests, as to expenditures and benefits, in respect to the matters now questioned, and where important rights have accrued on the faith of the unity of the interests, amounts to such acquiescence as should operate as an estoppel." 117 U. S. 467–469. The court, in that case, in no way maintained any suit on the contract supposed to be unlawful; but simply refused to set it aside at the demand of parties, by reason of whose silence, and omission to seasonably interpose any objection, it had been acted upon as valid throughout a long course of judicial proceedings.

The distinction is clearly brought out in *Pennsylvania Railroad* v. *St. Louis &c. Railroad*, above cited, in which it was

argued, substantially as in the present case, that, although the contract of lease might be void, so that no action could originally have been maintained upon it, yet there had been for years such performance of it, in the use, possession and control by the defendants of the plaintiff's road and franchise, that they could not now be permitted to repudiate or abandon it; and that the case came within that class in which it had been held that, where a contract has been so far executed that property has passed and rights have been acquired under it, the courts will not disturb the possession of such property, or compel restitution of money received under such a contract. In answering that objection, Mr. Justice Miller, speaking for the court, said: "Undoubtedly there are such decisions in courts of high authority, and there is such a principle, very sound in its application to appropriate cases. But we understand the rule in such cases to stand upon the broad ground that the contract itself is void, and that neither what has been done under it, nor the action of the court, can infuse any vitality into it. Looking at the case as one where the parties have so far acted under such a contract that they cannot be restored to their original condition, the court inquires if relief can be given independently of the contract, or whether it will refuse to interfere as the matter stands." And whether, in the case then before the court, the lessee might be liable to the lessor, as on a *quantum meruit,* for the use of its road, was not decided, because not presented. 118 U. S. 316–318.

In *Salt Lake City* v. *Hollister,* above cited, it was said that, in cases of contracts upon which corporations could not be sued because they were *ultra vires,* "the courts have gone a long way to enable parties, who had parted with property or money on the faith of such contracts, to obtain justice by recovery of the property or the money specifically, or as money had and received to the plaintiff's use." 118 U. S. 263.

The true ground of relief in such cases is clearly shown in a line of opinions, two of which were cited by Mr. Justice Miller in support of the proposition just quoted, in which municipal corporations, having received money or property under contracts so far beyond their powers as not to be capa-

ble of being enforced or sued on according to their terms, have been held, while not liable to pay according to the contracts, to be bound to account for the money or property which they had received.

Thus, in *Hitchcock* v. *Galveston*, 96 U. S. 341, 350, where a city was sued for damages for putting an end to a contract with the plaintiffs for the improvement of its sidewalks, the only invalid part of which was its promise to pay in bonds, which it was beyond its powers to issue, it was decided that the invalidity of that promise was no reason why the city should not pay for the benefits which it had received from the plaintiff's performance of the contract, Mr. Justice Strong, in behalf of the court, saying: "It matters not that the promise was to pay in a manner not authorized by law. If payments cannot be made in bonds, because their issue is *ultra vires*, it would be sanctioning rank injustice to hold that payment need not be made at all."

So in *Louisiana* v. *Wood*, 102 U. S. 294, 299, a city, which had received money for bonds issued by it without authority and at an illegal rate of interest and purchased by the plaintiff, was held liable, not on any contract of purchase, nor on any express contract whatever, but on a contract implied from its receipt of the money, Chief Justice Waite saying: "There was no actual sale of bonds, because there were no valid bonds to sell. There was no express contract of borrowing and lending, and consequently no express contract to pay any rate of interest at all. The only contract actually entered into is the one the law implies from what was done, to wit, that the city would, on demand, return the money paid to it by mistake, and, as the money was got under a form of obligation which was apparently good, that interest should be paid at the legal rate from the time the obligation was denied. That contract the plaintiffs seek to enforce in this action, and no other."

Again, in *Parkersburg* v. *Brown*, 106 U. S. 487, 503, where individuals, in consideration of bonds issued to them by a city for a purpose beyond its powers, executed to the city a trust deed, in the nature of a mortgage, to secure the payment of the bonds and interest, it was held that the bonds could not

be enforced against the city, but that the mortgagors had a right to reclaim the property and to demand an account of the city; and Mr. Justice Blatchford, in delivering judgment, said : " The enforcement of such right is not in affirmance of the illegal contract, but is in disaffirmance of it, and seeks to prevent the city from retaining the benefit which it has derived from the unlawful act. There was no illegality in the mere putting of the property by the O'Briens [the mortgagors] in the hands of the city. To deny a remedy to reclaim it is to give effect to the illegal contract. The illegality of that contract does not arise from any moral turpitude. The property was transferred under a contract which was merely *malum prohibitum*, and where the city was the principal offender. In such a case, the party receiving may be made to refund to the person from whom it h:'s received property for the unauthorized purpose, the value of that which it has actually received."

The case of *Chapman* v. *Douglas County*, in which the opinion was delivered by Mr. Justice Matthews, is to the same effect.   107 U. S. 348, 355 *& seq.*

In *Pittsburgh &c. Railway* v. *Keokuk & Hamilton Bridge*, it was stated, as the result of the previous cases in this court, that " a contract made by a corporation, which is unlawful and void because beyond the scope of its corporate powers, does not, by being carried into execution, become lawful and valid, but the proper remedy of the party aggrieved is by disaffirming the contract and suing to recover, as on a *quantum meruit*, the value of what the defendant has actually received the benefit of."   131 U. S. 371, 389.

The view which this court has taken of the question presented by this branch of the case, and the only view which appears to us consistent with legal principles, is as follows :

A contract of a corporation, which is *ultra vires*, in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract can-

not be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it.

When a corporation is acting within the general scope of the powers conferred upon it by the legislature, the corporation, as well as persons contracting with it, may be estopped to deny that it has complied with the legal formalities which are prerequisites to its existence or to its action, because such requisites might in fact have been complied with. But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation, nor the other party to the contract, can be estopped, by assenting to it, or by acting upon it, to show that it was prohibited by those laws.

The doctrine of the common law, by which a tenant of real estate is estopped to deny his landlord's title, has never been considered by this court as applicable to leases by railroad corporations of their roads and franchises. It certainly has no bearing upon the question whether this defendant may set up that the lease sued on, which is not of real estate, but of personal property, and which includes, as inseparable from the other property transferred, the inalienable franchise of the plaintiff, is unlawful and void, for want of legal capacity in the plaintiff to make it.

A contract *ultra vires* being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it.

In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract.

The ground and the limits of the rule concerning the remedy, in the case of a contract *ultra vires*, which has been partly performed, and under which property has passed, can hardly be summed up better than they were by Mr. Justice Miller in a passage already quoted, where he said that the rule "stands upon the broad ground that the contract itself is void, and that nothing which has been done under it, nor the action of the court, can infuse any vitality into it;" and that "where the parties have so far acted under such a contract that they cannot be restored to their original condition, the court inquires if relief can be given independently of the contract, or whether it will refuse to interfere as the matter stands." *Pennsylvania Railroad* v. *St. Louis &c. Railroad*, 118 U. S. 317.

Whether this plaintiff could maintain any action against this defendant, in the nature of a *quantum meruit*, or otherwise, independently of the contract, need not be considered, because it is not presented by this record, and has not been argued. This action, according to the declaration and the evidence, was brought and prosecuted for the single purpose of recovering sums which the defendant had agreed to pay by the unlawful contract, and which, for the reasons and upon the authorities above stated, the defendant is not liable for.

*Judgment affirmed.*

Mr. Justice Brown, not having been a member of the court when this case was argued, took no part in its decision.