No. 13,950.

J. B. ATKINS, ET AL. VS. SHREVEPORT AND RED RIVER VALLEY RAILWAY COMPANY.

SYLLABUS.

1. A clause in a contract evidencing the grant of aid to a railway company, which is to construct a line of road on the *east* side of Red River, that the company shall operate tow boats with convenient barges at points on the river so as to furnish transportation to freight and produce, and to operate the boats as low down stream as the lower boundary line of the parish granting the aid, is held to mean that the railway company should run a boat or boats, towing barges when necessary in seasons of law water, up and down the river front of the parish, making frequent connection with the railroad at the points in the parish where the railroad touched the river, to the end of giving the people of the .parish living on the river, especially those on the *west* bank, direct, easy and continuous connection with the railroad.

2. It was altogether competent and legal for the railroad company to stipulate to do this. There is nothing of *ultra vires* character about it.

3. Besides, if the stipulation was not *intra vires*, it does not lie in the mouth of the railway company, which received the aid, to set the same up as defense.

4. Such a stipulation is a consideration of the grant; it is more—it is a material consideration ; and the railway company fails to earn the tax whenever it fails to meet the condition.

5. The obligation of the railway company in this regard is not fulfilled by a

contract with a boat already in the river making fortnightly trips from New Orleans to Shreveport, to receive and transport such freight and produce as may be offered for shipment.

6. Since the railway company could earn the tax only by running boats agreeably to the intent of the contract, a putting *in mora* was not required.

A PPEAL from the First Judicial District, Parish of Caddo— *Land, J.*

*Sutherlin & Hall* and *Egan & Scheen,* for Plaintiffs, Appellants.

---

*Leonard, Randolph & Rendall* and *Alexander & Wilkinson,* for Defendants, Appellees.

---

The opinion of the court was delivered by

BLANCHARD, J. Certain taxpayers of the Parish of Red River, for themselves, and the Police Jury of the parish, for the body of the taxpayers, bring this action to have declared forfeited a special tax of five mills voted by the property taxpayers of the parish in aid of the defendant company.

The ground for this demand of forfeiture is the non-fulfillment of the conditions attached to the grant.

In the year 1897 petitions addressed to the Police Jury were circulated throughout the parish praying that body to submit to the property taxpayers a proposition to vote the tax. It is averred by plaintiffs that these petitions were gotten up and circulated by the defendant company. This, however, is not of much moment.

The law required at least one-third of the property taxpayers of the parish should sign the petition before the Police Jury could act.

The requisite number having signed, the Jury adopted an ordinance submitting the proposition to the property taxpayers at an election called for the purpose, and at this election, held on the 23rd of September 1897, a majority in number and in amount or value of property voted in favor of the tax.

Following this the Jury and the railway company entered into a formal contract, the first obligating itself to extend upon the assessment rolls of the parish the tax of five mills for ten years in favor of the second, and the latter obligating itself to build and operate the line of road in aid of which the tax was voted.

In this contract the petition of taxpayers aforesaid is referred to as

containing the reciprocal obligations of the contracting parties, and a copy of the petition is annexed to and made part of the contract.

Following the execution of the instrument evidencing this contract, the Police Jury adopted an ordinance levying the tax and ordering its collection.

As the petition of taxpayers to the Police Jury, praying the submission of the proposition to vote the tax, was the initial step required by law in the movement to grant the aid, and as this petition contains the terms and conditions upon which the grant was to be made we copy the same as follows:

"The undersigned petitioners constituting more than ⅓ of the property tax-payers of the Parish of Red River, State of Louisiana, with respect represent that the construction of the Shreveport & Red River Valley Railroad by the Shreveport & Red River Valley Ry. Co., a corporation duly organized under the laws of Louisiana, from the City of Shreveport   *   *   *   on a line intersecting the northern boundary of said Parish of Red River and running thence in a southerly direction to within the incorporated limits of the town of Coushatta   *   *   *, said town being the terminus of said road—said road to be constructed of the best material of modern equipment—will be of great benefit to the people and property of said Parish of Red River—

"We, therefore,   *   *   *   respectfully pray that your Honorable body will levy a special tax of five mills annually for a period of ten years in aid of said Shreveport & Red River Valley Ry. Co., commencing January 1st, 1898, and said tax to be levied for the years 1898-1899-1900-1901-1902-1903-1904-1905-1906 and 1907.

"Provided, that this tax is voted and to be levied under the following conditions, to-wit:—

"That said Shreveport & Red River Valley Ry. Co. shall commence work on the construction of said railroad from the said City of Shreveport within thirty days after the promulgation of a favorable vote taken hereon, and shall fully complete and put in operation said railroad from said City of Shreveport to within the corporation limits of the said town of Coushatta within twelve months from the promulgation of said favorable vote taken hereon, and shall continuously operate through trains on said road, unless prevented by war, overflow, labor strikes, or other unforeseen fortuitous events, and no part of said tax to be paid said company until the completion and operation of trains thereon.

"Provided, further, that said Shreveport & Red River Valley Ry. Co. shall operate tow-boats or steam tugs with convenient barges at such points on the stream of Red River as to furnish transportation of such freight and agricultural products as may be assembled at such points, and to operate such boats or steam tugs with convenient barges as low down said stream of Red River as the present site of Lake End, La.

"Your petitioners further pray your Honorable body to order an election according to law to take the sense of the property tax-payers on said proposition for or against said proposed aid—the ballots to be

used at said election to be written or printed in the following form, viz:—

"For a special tax of 5 mills in aid of the Shreveport & Red River Valley Ry. Co. for the time and on the conditions set forth in the petition of the property tax-payers.

"Against the special tax of 5 mills in aid of the Shreveport & Red River Valley Ry. Co. for the time and on the conditions set forth in the petition of the property tax-payers—

"With the name of the voter and the value of his assessed property written on each ballot.

"And for which we will ever pray, &c."

The special election at which the tax was voted was held and conducted in all respects as thus petitioned for.

The railway company completed the road to Coushatta and put the same in operation within the time named in the petition. The line was inspected by the Police Jury and that body, by formal ordinance passed on November 23, 1898, accepted the road and instructed the tax collector to pay over to the company "the special tax levied in aid of the construction thereof, as provided by law, as long as said company continue to comply with their contract."

It appears that this tax for the years 1898 and 1899 has been paid to the company.

The present suit was filed September 10, 1900, and decided in the lower court March 9, 1901. The decision was adverse to the plaintiffs and they prosecute this appeal.

The contention of the appellants is that the conditions upon which the tax was voted that have not been fulfilled are:—

1. The town of Coushatta was stipulated to be *the terminus* of the line—whereas, in point of fact, the road, after reaching Coushatta, passed on southward into and through other parishes than the Parish of Red River and has made some point other than Coushatta its terminus.

2. The company undertook to operate, in connection with the railway, boats or tugs with barges on the river for the convenience of shippers and receivers of freight—which stipulation has not been met and fulfilled, at least not so since the latter part of February 1899, at which time a boat, the Uni, owned and operated by the railway company, was destroyed by fire.

It is insisted that these being essential and continuing conditions of the grant the failure to meet them operates the forfeiture of the tax.

As to the demand of the Police Jury, the defendant filed an excep-

tion of no cause of action. The contention in this regard is that the Jury has no right to bring the suit or stand in judgment therein; that it has no public function to perform in connection with the suit and no interest in the controversy; that when it levied the tax it performed the specific duty imposed upon it by law; and that thereafter its connection with, and legal duty towards, the tax ceased.

Defendant also pleaded, as against that part of the plaintiffs' demand founded upon failure to operate tow boats in the river, that the petition does not allege there had been a putting *in mora.* In this connection, it is urged that demand upon defendant—a putting in default—was a prerequisite to the institution of the suit.

Reserving its exceptions, it answered denying that it was one of the conditions of the contract that Coushatta was to be the terminus of the railway. It averred that the material and sufficient consideration for the grant was the construction of the road from Shreveport to Coushatta within the time agreed upon and the continuous operation of its trains thereon since that time, both of which are affirmed.

It charged that the stipulation as to the operation of tow boats was not *intra vires,* nor a material consideration, but that should it be held material then it has been fully complied with.

We do not find it necessary to pass upon the exception challenging the right of the Police Jury to appear as party plaintiff in the suit.

Undoubtedly, taxpayers in interest have a standing in court to bring the action and certain of them have done so. Thompson on Corp., Vol. 1, § 1130. All the points raised may be adjudicated as well with them as sole plaintiffs, as could be the case were the Jury a co-plaintiff.

The contract between the people of Red River Parish and the railway company had for its object, on part of the people, the construction and operation of the railway into the parish and to the county seat, and, on part of the company, the obtaining of financial aid by means of the tax in furtherance of the construction of the road.

But this was not all. The people had the right to attach other conditions to this grant of the tax and did so, and the railway company agreed to these conditions, and in order to earn the tax it must meet the same year by year, during the term, at least, for which the tax was voted.

In the ordinance passed by the Police Jury accepting the road and instructing the tax collector to pay over the avails of the tax to the company, it is specially stipulated that this "paying over" was to take

place *"as long as said company continues to comply with their contract."*

This meant, and could only mean, that the tax was to be paid over each year as collected, provided the company met those conditions of the contract which were *continuing* in character. That is to say, the company had agreed to do something which was to be done *after* the road was constructed and accepted, and this "something" had to be done or else the tax was not to be paid over.

We do not think the contract stipulates *as a condition* of the grant that the town of Coushatta should be and remain *the final terminus* of the road. True, the town is referred to in the taxpayers petition as being the terminus of the road, but this is held to have been descriptive merely.

The taxpayers might have made it *a condition* of the grant and had they done so and the company had disregarded it, it would be ground for forfeiture of the grant. Elliott on Railroads, Vol. 2, Secs. 856, 862; Beach on Contracts, Vol. 1, Secs. 90, 129, 131; Thompson on Corp., Vol. 1, § 1130.

The reference to Coushatta as the terminus of the road is found only in the first clause of the petition of taxpayers, where it is recited that the construction of the road into the parish and to the town of Coushatta would be, in the opinion of the signers, "of great benefit to the people and property" of the parish.

But in that part of the petition, following the prayer for the levy of the special tax in aid of the railway, where the conditions of the grant are set forth, no mention is made that Coushatta should be and remain the terminus.

The language there used is: "Provided that this tax is voted and to be levied under the following conditions, to-wit:"

Then follow the declaration (1) that work on the construction of the road should commence within thirty days from the Shreveport end of the line and the road should be completed and put in operation from Shreveport to Coushatta within twelve months, and the company should continuously thereafter operate through trains on the road; and (2) that the railway company should operate tow boats or steam tugs with barges on the river as far down stream as Lake End, which is a village on the river near the lower boundary line of the Parish of Red River.

These are, we hold, the two conditions, and the only two, attached to the grant.

The first has been complied with. About this no question is raised.

But the tax is not to be considered earned by compliance with one only of the two conditions named. C. C. 2021, 2026, 2028.

Every condition must be performed in the manner it is probable that the parties intended it should be. C. C. 2037; Pothier on Obligations, Vol. 1, 206.

Where several conditions are connected by a copulative conjunction *all* of them must be accomplished, and if any one is not so, the obligation fails.

Pothier on Obligations, Vol. 1, 223; Bouvier's Law Dictionary, *verbo* "Condition."

The accomplishment of conditions' is indivisible, even when the thing which is the object of the condition is something divisible. Pothier on Obligations, Vol. 1, 215.

The effect of a condition is to suspend the obligation until the condition is accomplished; till then nothing is due. *Ibid.*, 218.

On the failure of any condition to do or not to do, the other party may sue to dissolve the contract.

C. C. 1926, 2046.

"A railroad company, or one claiming through it, there being no estoppel, must perform the conditions prescribed, or else there can be no effective claim to the aid." Elliott on Railroads, Vol. 2, Sec. 856.

So, too, where the vote is for a subscription upon condition, the railroad company has a right to the voted aid only upon a strict performance of the conditions.

*Ibid.*, Sec. 861 (note 4, citing 73 Ind. 543; 24 Kan. 170; 99 Ill. 205); Thompson on Corporations, Vol. 1, Sec. 1130.

The obligation of the subscriber does not become binding until all conditions have been performed. Thompson on Corporations, Vol. 2, Secs. 1332, 1334, 1335, 1344, 1352.

Has the second condition imposed by the taxpayers in voting this tax been complied with?

To answer this requires the court to construe that part of the petition of taxpayers referring to it, to the end of ascertaining its true meaning and intent.

The condition is that defendant company "shall operate tow boats or steam tugs with convenient barges at such points on the stream of

Red river as to furnish transportation of such freight and agricultural products as may be assembled at such points, and to operate such boats or steam tugs with convenient barges as low down said stream of Red river as the present site of Lake End, La."

What was the object of the grantors of the tax in insisting upon this as one of the conditions of the grant? What purpose was the stipula- tion designed to effectuate? What did the contracting parties mean; what was in their minds at the time this condition was stipulated for by the grantors and agreed to by the grantee?

To answer these queries we must look at the situation as it then existed; we must consider the environment of the parties at the time, especially that of the people of Red River Parish. And it must be borne in mind that if anything doubtful or obscure appear in the terms of the contract, the construction should be against the railroad rather than against the public, for the railroad was the moving party; it sought the public aid; it prepared the contract. 24 Kan. 181.

The parish, physically, is divided by the Red river. The railroad was to be located on the east side of the river. It would run parallel to and near the river, but not on the immediate bank. It would, how- ever, touch the river—that is to say, its bank—at several points in the parish. At these points immediate connection would be made with the river and with boats in the river.

Prior to the advent of the railroad the only means of shipment of their produce the people of the parish had was the river. Their only access to the markets of the world for the purchase of supplies and for the sale of their cotton was by means of boats in the river.

For years the navigation of the river had been practically monopo- lized by a single line of boats owned by a company and known as "the Red River Line," commonly called on the river "the Pool Line."

The people wanted competition developed to this line, to the end of securing better freight rates. Therefore, they doubly welcomed the coming of the railroad.

But a large part of the people of the parish lived on the west side of the river and a very large part of the valuable property in the parish was located on that side.

The proposed tax in aid of the railroad was to be a parish tax—to be a charge on all the property in the parish.

The people and property on the east side of the river would be greatly benefitted by the railroad. It would be at their doors.

Not so with the people and property on the west side. The river intervened between them and the railroad. The direct benefit resulting to them by the construction of the road would not be at all comparable with that received by the people on the east side.

Yet the tax was to be voted by *all* the people. If the taxpayers on the west side were hostile, it were likely the vote on the proposition to grant the aid would be adverse. The railway company recognized this; everybody did.

Something must be done to equalize the benefits to the sections of the parish—the one east of the river, the other west.

The only way to do this was to bring the west side in direct touch and connection with the railway. This could be done by the railway company putting a boat or boats in the river to ply along the river front of the parish, making connection with the railway at the points where it touched the river, thus affording the people of the west side an easy access to the rail, and the people all along the river, on both sides of the parish front, the benefit of active competition with through boats navigating the river.

Under these circumstances the people of the parish and the railway company entered into the contract.

The railroad wanted the votes of the taxpayers on the west side; these taxpayers wanted the river navigated by a boat or boats running in connection with the railroad in such way as to enable them to easily reach the railroad.

Read in the light of the situation then existing, the meaning and intent of the second condition of the grant is clear.

It meant that the railroad company should run a boat or boats, towing barges when necessary in seasons of low water, up and down the river front of the Parish of Red River, making frequent connection with the railroad at the points or places in the parish where the railway touched the river, to the end of giving the people of the parish living on the river, especially those on the west bank, direct, easy and continuous connection with the railroad.

It was clearly intended to give every one in the Parish of Red River the use and benefit of the road for which aid was voted. To thus operate a boat to tow barges so as to carry freight from points on the river to the railroad is an adjunct to the railroad, would tend to facilitate transportation by rail, and was not beyond the scope of defendant company's charter.

It was altogether competent and legal for the railway company to stipulate to do this. There was nothing of *ultra vires* character about it.

It is not reprehensible for a railroad company to own and operate boats in connection with and as feeders to its line of railway.

Thompson on Corporations, Vol. 5, Sec. 5874; Elliott on Railroads, Vol. 2, Sec. 374, note.

Besides, if this stipulation of the contact was not *intra vires,* it does not lie in the mouth of defendant company to set this up as defense.

A railway company accepting a county subscription as made by the county accepts it as tendered by the county, with all of its terms and conditions, and is estopped from contending that such terms and conditions are void and unreasonable.

When a contract is not *malum in se* a party cannot plead *ultra vires* without doing justice and restoring what has been received. Thompson on Corporations, Vol. 5, Sec. 6003 *et seq.*

The railway company cannot claim the tax and repudiate one of the stipulations upon which the grant was made to it. If it repudiate the transaction at all it must repudiate it altogether. If it sets up the defense of *ultra vires* it must restore what it has received of the grant made.

Green's Brice's *Ultra Vires,* 2nd Am. Ed., p. 717; Reese's *Ultra Vires,* Sec. 74; Elliott on Railroads, Vol. 2, Sec. 372; 139 U. S. 59.

Like an infant or married woman, the corporation cannot repudiate and enforce the contract at the same time. C. C. 1792, 1793.

The stipulation as to the running of boats in connection with the railway is held to be a material consideration of the contract and the railway company cannot earn the tax year by year as it matures without a substantial compliance with it.

Since it could only earn the tax by running the boats, a putting *in mora* was not required. When the company failed to run the boats according to the intent of its contract there was what is considered the equivalent of an active violation of the contract, and this rendered demand and putting in default unnecessary. C. C. 1931, 1932, 1933; 29 La. Ann. 329; 50 La. Ann. 1297.

Besides, the rule with respect to putting *in mora* does not apply to contracts depending upon a condition precedent where no claim for

damages for inexecution is made. Railroad Co. vs. Dillard, 51 La. Ann. 1487.

The evidence shows defendant company has at no time fully met its obligation in respect to the matter of running boats in the river, and since from about the 1st of March 1899 (when the boat it had in the river burned) down to the trial of this case in the District Court there has been little better than a pretense of compliance.

About the time the Police Jury accepted the road as constructed as a compliance with that portion of the contract requiring consruction, a boat called the Uni was chartered by the company to run in the river in connection with the railroad. Subsequently the company purchased the boat and ran it until the last of February 1899 when it was destroyed by fire.

The Uni, it seems, did not run up and down the river front of the parish, giving the frequent connection with the rail which, under our interpretation of the contract, should have been done; but continued its trips long distances down the river, sometimes as far as its mouth.

These extended trips prevented, of course, that easy and frequent access to railway points on the river within the limits of the parish by means of boat transportation, which, under the contract, was the due of the people of the parish living on the west side of the river.

Nevertheless, such as the service was it seems to have been accepted by the people and the tax for 1898 and 1899 was paid.

Under the view herein expressed they might well have objected to the service as inadequate under the contract and declined payment of the tax. But they did not do so; the tax for those years was paid, has been received by the company and that ends the matter so far as the years 1898 and 1899 are concerned.

For the period following 1899 this suit stands as a barrier to the payment of the tax to the company.

After the burning of the Uni there was no effort whatever made of compliance with the tow boat requirement until the middle of August following, when what purports to be a contract with the Red River Line was entered into whereby the Steamer Scovell of that line was engaged to run "in the waters of the Mississippi and Red river, between the City of New Orleans and the City of Shreveport, or so long as the waters of Red river will permit the navigation to said City of Shreveport, and in low water to operate said steamer as high up the stream of Red river as navigation will permit and particularly

Atkins et al. vs. Railway Company.

to transport, with convenient barges, etc., such freight and agricultural products as may be assembled at points on the stream of Red river, in the Parish of Red River, navigation permitting, to such other points on Red river as the owners and shippers thereof may desire, charging the shippers therefor an equitable and reasonable freightage to be fixed by the party of the first part (the Red River Line) at a rate which in their judgment is proper and just."

Then follows a stipulation that the boat is to be operated in the name of the railroad company and all bills of lading are to be issued in its name, but the railroad company is to be held harmless against all loss of freight, and harmless against all claims for damages for injuries to passengers or crew, and harmless against all other claims of any nature whatsoever that may arise in the operation and management of the boat, and the steamboat company is to have all the revenues and profits accruing in the operation of the steamer.

The only consideration named is the sum of one dollar which is to be paid the steamboat company by the railroad. A bond in the sum of $15,000 is to be given by the steamboat company to the railroad, conditioned·upon the performance of the contract.

The evidence shows that the steamer Scovell was at the time, and had long been, one of the four or five Red River Line boats operating in Red river and plying between New Orleans and Shreveport, and that after this contract was entered into no difference was perceptible in the running, operation and management of the boat over what had been the case prior to the signing of the contract, and over what was the case with the other boats of the line, with this exception, that the bills of lading of the Scovell were issued in the name of the railroad and she was advertised as running under the auspices of the railroad.

The boat continued a common carrier on the river just as she had been for years. Prior to the contract she would take freight from New Orleans, ascending, or from Shreveport, descending, to way points on the river, and from one way point to another, just as she continued to do after the contract was signed, and her owners continued to enjoy all the profits and.stand all the losses of her running the river just as they had always done, charging such freight rates as they pleased, or were permitted to charge by the Railway Commission of the State.

It was the merest pretense of a contract, and it is patent that the only motive influencing to its execution was a make-shift compliance

with one of the conditions of the tax grant made to the railroad by the people of Red River Parish, and this with the sole view of claiming that the tax had been earned.

This steamboat contract gave the people of the parish absolutely nothing new—nothing they did not have and enjoy before it was entered into.

It cannot for a moment be supposed that the taxpayers of the parish, when they stipulated that the railway company should run towboats with barges as low down the river as Lake End, and the Police Jury on their behalf, in all its proceedings, emphasized the conditions of the grant and even caused them to be referred to, and voted on the ballots themselves, ever contemplated that such an agreement as above depicted with the Red River Line would be tendered as a substantial compliance.

By the term "towboats or steam tugs, with convenient barges" was meant not towboats or steam tugs as used in the deep water of maritime ports, but such boats as could navigate the Red River along the front of that parish practically at all seasons, towing barges when necessary in low water to lighten the draught.

We have already construed the requirement to mean that these boats were to run up and down the river front of the parish, making frequent connection with the railroad at the points where the road came out to the river.

Now, the evidence shows that it took from ten days to two weeks, and sometimes three or four weeks, when the water was very low, for the Scovell to make her trips from New Orleans to Shreveport and return; so that, in point of fact, she passed along the front of Red River parish going up not oftener than once in two weeks, and going down the same.

That this was altogether an insufficient compliance with the contract made with the people of the parish is self-evident. It was the reverse of frequent, easy and continuous connection with the railroad. and it afforded no competition on the river.

We have heretofore stated that the running of the Uni from the upper part of the parish to the mouth of the river was not a compliance. Much more lacking in that respect is this substitute agreement to run the Scovell from Shreveport to New Orleans.

Counsel for defendant company claim that the Scovell was operated in the river about the same as the Uni had been, and that the petition

of the plaintiffs concedes the running of the Uni was a substantial compliance with the contract.

This being so, they contend that plaintiffs cannot now set up the contract with the Scovell and her operations in the river under the same, as lacking sufficient compliance.

We do not view plaintiffs' petition in this light. There is no allusion therein to the running of the boats to the mouth of the river, but merely a statement that on the 23rd of November, 1898, the defendand caused the road to be inspected by the Police Jury and "placed a boat in Red River as required by said conditions and stipulations in the petition of taxpayers."

There is nothing here about the operation of the boat—only a mention of its being placed in the river. Presumably, the boat had not then fairly begun its operations, since it was only that day, November 23, 1898, that the Jury accepted the road.

Elsewhere in the petition is the allegation that defendant had violated its contract by * * * "failing and refusing for more than a year and a half to operate towboats," etc. While this language implies that at one time, or for a while, to-wit: when the Uni was in the river, the railroad company had sufficiently complied with the towboat requirement, it does not follow that because the taxpayers chose to put up for three or four months with the running of the Uni as far down as the mouth of the river, they have no cause of complaint against the running of the Scovell as the railroad boat when she was owned by a transportation line competing with the railroad, and made fortnightly trips from New Orleans to Shreveport and return.

The Uni was owned by the railroad and was a competitor of the Red River Line boats. Even though she did now and then go to the mouth of the river, her trips along the river front of the parish were far more frequent than those of the Scovell, and the evidence is that while she was running the people on the west bank of the river could and did receive and ship freight and cotton by the railroad through the aid of this boat, but that since she was burned, in February, 1899, efforts to connect the railroad with the river have practically been abandoned, and planters on the west bank, who had shipped cotton from their landings by the Uni and the railroad in connection with each other, now have to haul it to Coushatta, or some other point, ferry it over the river and haul it to the railroad in order to ship by the latter.

The contention that this tax should not be declared forfeited because the parties cannot be placed in *statu quo,* because no *restitutio in integrum* can be made, is without weight.

We know of no case wherein this argument has been adopted by any court where a subscription was based upon conditions.

If the argument were sound, it would be idle and useless to ever attach any condition to a subscription, other than the road should be constructed.

Where a railway is constructed, it cannot well be torn up in order to restore the situation as it was before the tax was voted or the road constructed.

The taxpayers have received nothing that they can return. They did not become owners of the road by voting the tax. They, therefore, have no road to return to the company. The roadbed, its material, workmanship and equipment belong to the company, and the latter has parted with nothing to be restored. See Memphis K. & O. Ry. Co. vs. Thompson, 24 Kan. 183.

If the company expended its money in constructing the road, they own it, and thus have the equivalent for the money invested.

We hold plaintiffs have made out a case for the forfeiture of the tax for the period covered by their suit—say the year 1900.

The year 1901 is drawing to a close, and the tax for that year is now due; but we are not apprised that the same conditions existed in 1901 warranting the forfeiture of the tax for that year, as it did in the preceding year. If they did, the tax is equally forfeited for that year, and will be equally forfeited for each year of failure of compliance on part of defendant company with its contract with the taxpayers of the Red River Parish as herein interpreted.

But we can, in this suit, deal only with the tax for the period of one year—1900. From and inclusive of that year the tax has yet eight years to run. *Non-constat* that the defendant may not comply with its contract obligation for the remaining years of the tax term.

If it should, and earn the tax, it must be paid; if it should not, the tax is not earned and should not be paid.

We reserve to all parties all rights in the premises.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be avoided and reversed, and it is now adjudged and decreed that the tax voted by the taxpayers of the Parish of Red River, in the year 1897, in aid of the Shreveport & Red

River Valley Railway Company, be and is hereby declared forfeited, canceled and annulled in so far as that portion of the said tax due for the year 1900 is concerned, and that defendant pay costs of both courts.

Rehearing refused.