Statement of the Case.
MONROE, J.
Plaintiff sues for a division of the net profit of an alleged partnership between the defendants (Hampton Reynolds and Mark A. Morse) and itself, and for an injunction, pendente lite, to restrain defendants from collecting or disbursing alleged partnership funds. Defendants aver that the petition discloses no cause of action; that plaintiff, being a banking corporation created under the laws of this state, was, and is, legally incapable of entering into a contract of partnership; that no proposition that it should do so was ever made or considered; that there were negotiations with a view to a contract of that kind between them (defendants) and Lynn H. Dinkins (who is plaintiff’s president), individually; but that they came to naught, for the reason that it was understood that there should be no contract until the agreement arrived at should be expressed in writing, which was nevfer done. The grounds of defense were set up in the answer to the rule nisi (ordering defendants to show cause why the injunction should not issue), and in the exceptions to the petition, upon the hearing of which, all the evidence was adduced, and, the rule having been made absolute and the exceptions overruled, defendants filed their answer, setting up the same defenses, whereupon the case was submitted, and there was judgment for plaintiff, from which defendants have appealed.
The ease, as disclosed by the testimony of the witnesses examined on behalf of plaintiff and defendants, respectively, is as follows:
Defendant Reynolds, being a civil engineer in the employ of the Public Belt Railroad Commission, became impressed with the idea that, by means of cars, to be operated over the belt road, the material required for the construction of certain levees, along the river front, for which contracts were then béing advertised by the Orleans Levee Board, could be handled with a facility of which levee contractors in general were probably not aware, and hence that, if he could become the successful bidder for the contracts, he could make a handsome profit. He was, however, without means, and it therefore be-' came necessary for him to interest some one, who, for a share of the profits, would be willing to advance the money which would be required. 1-Ie, accordingly, spoke to his friend T. F. Cunningham, who (testifying as a witness in his behalf) says that he “volunteered to introduce him to some of the bankers in the city and see if they could not make some arrangement with him so that the work could be carried out.” And Mr. Lynn H. Dinkins was one of the bankers *196 to whom (in his office, at the bank) defendant was thus introduced, and to. whom he said (quoting the testimony of Mr. Cunningham) :
“He would be willing to go into -an arrangement whereby anybody who would take up the work with him and furnish the money would have a half interest and he the other half interest and $200 per month.”
To which Dinkins replied:
“That that was not a banking proposition, and that he did not think that he could entertain it. He declined, first, to listen to anything further in the matter.”
Mr. Cunningham was not interrogated any fufthér, but, from other sources, it appears that, though he did not consider it a banking proposition, Mr. Dinkins was persuaded that the proposition made by Reynolds promised a profit, and it occurred to him that, whilst Reynolds was a young man, without means or financial credit, and whose capacity for the proposed work was unknown, if he (Din-kins) could bring into the matter a third person who possessed those qualifications, i. e., financial responsibility and known expe- - rience in contract work, and who would be willing to stand between the bank and possible loss, something might be done. He, accordingly, interviewed the defendant Capt. MorS'e, who was a stockholder in the bank, supposed to be worth $75,000, who possessed the desired experience, and whose son was then actually engaged in levee building, and he testifies that, as between him and Morse (it being, apparently, assumed that Reynolds would consent), and, after Morse and his son had made some investigations on their own account, an agreement was entered into, as follows (quoting the testimony):
“I told the Captain that, inasmuch as we were relying entirely upon his experience and judgment, and, before we would become interested, it would be necessary for him to stand between the Interstate Trust & Banking Company and any loss which might be incurred. He demurred for some time, and finally said that, if proper arrangements could be made, he might be willing to do that. * * * I meant that Capt. Morse was to be in charge of the work, and he knew what to bid for the work.' He knew what the work would cost, and (as) we were relying upon him, that he ought to be willing to be the first, loser in the transaction. Q. To what extent, a loser? A. To the extent of everything that he had. * * * Q. Your idea of the proposition which was under discussion was that, if the bank went in with Reynolds and Morse on that, of course you knew that Reynolds had nothing but his experience and knowledge of the proposition? A. Yes. Q. You realized that it was not a banking proposition? A. Exactly. Q. And that, in order to finance it, there must be some protection to the bank, if it should go into-any such deal, was it not? A. Yes, sir. Q. Did you understand by that that, in the event the proposition was an entirely- losing one, that Capt. Morse should bear those losses? A. Yes, first. Q. And if, after the exhausting of his $75,000 estate, there were any further debts, that the bank would be liable? A. Yes, but only up to $35,000.”
With that understanding between him and Morse, Dinkins (as he testifies) brought Morse and Reynolds together, at the bank, and, without saying exactly what took place at the interview, he further testifies as follows:
“After the transaction had been whipped into shape by Capt. Morse, Mr. Reynolds, and myself, I suggested to them that perhaps our board of directors would not consider it favorably; I had mentioned it to ' one or two of them, and -they were not disposed to go into levee building.. * * * I suggested to them that it would be a good idea, in order to -bring the matter to a definite conclusion, promptly, that they would appear before the board of directors and state to them the proposition that we were then discussing. So, at a meeting of the board held prior to the letting of the contracts, I explained1 to the board the views of Mr. Reynolds and Capt. Morse, and told the board that those .gentlemen were downstairs and would like to appear before, them. When they came up into the-board room, I again went over my understanding of their proposal and asked them if that was-,a correct version. They stated it was. There >was an indisposition on the part of some of the members of our board to go into the matter, and Capt. Morse and Mr. Reynolds discussed it in detail and explained to the board that no -other contractors knew of the facilities that the-Public Belt afforded, and that Mr. Reynolds, on account of his connection with the Public Belt Railroad, could obtain the very best results. ‘And then they were excused. After they left the room, we took a vote upon the matter and .decided to accept their proposition, and then the question of bidding came up for discussion. * * * We finally decided on a price to bid, and we certified Capt. Morse’s checks for the necessary amount, and bids were put in and. ’accepted.” ■
*198 It m.ay be here stated that it was also agreed (between Morse and Reynolds and Dinkins, and after the parties had left the directors’ room) that the bids, which were due in an hour or two, should be put in in the name of “Reynolds & Co.,” and, it appears that the deliberations and action of the directors, the agreement mentioned, the putting in of the bids,. the certification of Morse’s checks, to the amount of $2,600, to accompany the bids, and the acceptance of the bids by the levee board, all, as thus described, took place, in rapid succession, on the evening of August 20, 1908.
Mr. Dinkins’ testimony as to what occurred at the meeting of the board is corroborated by that of the directors who were present, to wit, J. W. Fairfax, "W. T. Maginnis, Leigh Carroll, and Charles Karste. Moreover, Fair-fax testifies that he had, previously, at the request of Dinkins, and, as a member of the executive committee of defendant’s board of directors, discussed the matter with Capt. Morse, always upon the theory that it was “mutual interest” (meaning that it was a matter of mutual interest between Morse and the bank), and that he had become convinced that it was a safe venture for the bank and was prepared to, and did, recommend it, at the board meeting. That what took place between Reynolds, Morse, and Dinkins, immediately after they had retired from the board meeting, was as stated above, is undisputed. On the following day (August 21, 1908) Reynolds and Morse called on Dinkins, at the bank, and discussed various matters connected with the work to be done, and, according to Dinkins, he suggested that the contract should be reduced to writing, to which they assented, and a call was then made at the office of the attorneys of the bank, where the parties were advised that the contract was one of partnership, into which the bank had no capacity to enter. Dinkins appears, thereupon, to have set himself to work to devise .a form of. written contract which-would leave the rights and obligations--.of-the parties unchanged, and yet would not be-obnoxious to the objection that it was ultra vires of the bank; and on September 15th-he dictated, in the presence of Morse or Reynolds, a projet of contract, which recites:That the firm of Reynolds & Oo. consists of Reynolds and Morse; that it contracts with the bank for the financing of certain' levee contracts; that the bank is willing to' make advances to the extent of $35,000; that the firm is to assign to the bank the moneys due, or to become due, by the levee board; that the profits accruing to the firm are to be divided in the proportions of onéthird to Reynolds one-third to Morse and one-third to the bank; and that the bank is to get interest, at 8 per cent, upon such money as it may lend the firm. The instrument thus prepared was never signed, but no suggestion was made that there was any error in the recitals whereby it was made to'appear that the bank was to make the advances and share the profits, etc.; the objection of Reynolds and Blorse being to the provision which called for the assignment to the bank -of the money, due, and to become due, by the levee board. And the same is true with regard to another projet, prepared by Dinkins, on ■September 22d. In the meanwhile, the parties had been acting under the verbal contract of August 20th, and they continued thereafter to act under it until October 6th, when their relations were terminated, as will be hereafter shown. Thus, the bank made advances on the notes of Reynolds & Oo., indorsed by Morse, as follows: On August 22d, $1,000; on September 4th, $8,000; on September 12th, $4,000; on September 19th, $4,000; on September 26th, $3,500; on October 3d, $5,000 — making a total of $20,-500. And Reynolds & 'Co. had been using the money so advanced in the prosecution of the work called for under the contracts with *200 the levee 'board. In the meanwhile, also, however, a question had arisen in regard to the bond, which the levee board required of the contractors to insure the faithful execution of the contracts. Dinkins had been of the opinion that, in view, of the solvency of Capt. Morse, such a bond would readily be furnished by one of the surety companies, and he conveyed to the others the idea that he would attend to it, and that there would be no trouble. There was trouble, however, for the surety companies declined to furnish the bond, and the bank refused to do anything in the matter, so that the moment finally arrived when Reynolds & Co. were told that, unless the bond was furnished at once, the contracts, on which a good deal of work had been done, but which had not been signed, would be declared forfeited. That being the situation, it was suggested by Mr. Dinkins that the Gulf States Investment Company, .of which he was president, and the directors and officers of the defendant bank, stockholders, should take hold of the matter ; the result being that Morse was required to put up $10,000 (in securities) in the hands of the investment company, which company, in turn, put up $20,000 (in securities) in the hands of a surety company, and the surety company gave the required bond; the investment company, for the service so rendered, exacting from Reynolds & Co. an obligation to pay it 10 per cent, of the profits arising under the latter’s contracts with the levee board. Dinkins testifies: That he told the directors that the bank ought to furnish the bond, but that some of them said, “No.” That he then said:
“Will you object to the Gulf States Investment Company interesting itself in making the bond? They said: No, they would not object to that, but they thought Capt. Morse should put up some securities; that Capt. Morse had these bonds (of a timber company) and some stocks; that he could dispose of them; that they thought the transaction was so large we ought not to take any chances on it at all; that we ought to have him put up some of his property. I explained to them some of Mr. Morse's ideas on real estate matters and mortgages, so they said: ‘Let him put up some of his bonds; we have them in the vault.’ So we arranged to get the Gulf States Investment Company. So Morse put up his securities to indemnify the Gulf States Investment Company, but they said that the Gulf States Investment Company ought to be paid for this; and, after discussing it for some time, they finally thought that 10 per cent, would be about right to pay for the making of the bond.”
The time within which the bond was to be furnished was then so short that Reynolds & Co. had no alternative but to accept the conditions thus imposed upon them. But Morse says in his testimony that he told Dinkins. that it was “a damned, infernal holdup,” and that Dinkins agreed with him. The bond was given and the contracts with the levee board -were signed on September 15th, though, as we have stated, work had been going on prior to that time. After-wards, to wit, on September 19th and 26th and October 3d, Reynolds & Co. obtained different sums of money from the bank. But on October 6th the firm paid the entire amount ($20,500) which had been obtained from the bank, with interest at 8 per cent, to date, and transferred its account to another bank; whereupon (on October 9th) Mr. Henry M. Young, “secretary of the Interstate Trust & Banking Company,” addressed a letter to Reynolds & Co., reciting that the bank had made a contract with that firm whereby it was to receive one-third of the profits of the levee contracts; that it had advanced $20,500 in compliance with its obligations thereunder; and that Reynolds & Co. had repaid the money, but had repudiated the contract.
“It is true,” the letter goes on to say, “that, at the time the contract was made between you and this company, through its president, it was contemplated that the terms thereof, which were, finally, and distinctly agreed upon, should be, subsequently, put in writing, in proper legal form, at the convenience of yourself and this company. Subsequently, to wit, on or about the 15th 'day of September, 1908, in accordance with the understanding, the terms of agreement were put in writing, the same being dictated by the president of this company in the *202 presence of one of the members of your firm. Your firm was, at that time, entirely willing to sign this written memorandum of agreement. The president of this company suggested, however, .that the draft be submitted to counsel before signature. This was done, with the result that counsel suggested certain, immaterial, amendments, which were embodied in a redraft of the said memorandum, made by the president of this company. This redraft of the memorandum was submitted to you by the president of this company on the day that he was leaving the city, to wit, September 23d. You stated that you would like to consider it until the next day, and it was left with you for that purpose. This company received no further communication from your firm in regard to the matter until, as above stated, you came in and paid off the amount of the advances which had been made to you and signified your intention of abandoning the contract. We desire, simply and formally, to notify you that this company is, and has always been, able, ready and willing to comply with all its obligations under the contract as originally made with you, upon the faith of which it loaned you amounts aggregating $20,500, and that it will expect you to, correspondingly, comply with your obligations thereunder.”
To the letter thus quoted, Reynolds & Co., through their attorney, replied, denying liability to, or contractual relations with, the bank.
The defendants, Reynolds and Morse, testify that their understanding was that they were negotiating with Dinkins individually, and that it was with him, .and not with the bank, that they entered into an agreement (which, according to Reynolds, was to become binding only when reduced to writing) to the effect that, he (Dinkins), and Morse were to furnish the money required for the levee contracts, and that, after the payment of a salary of $200 a month to Reynolds, the profits were to be divided equally between the three, which agreement appears to have been subsequently modified to the extent that Mark A. Morse, Jr., was, also, allowed a salary of $200 a month. They also testify, in effect, that they attended the meeting of the plaintiff's board of directors at the request of Dinkins, and, as they supposed, for the purpose of satisfying the members of the board that a profit could be made on the levee contracts, and thereby inducing them to loan the money required to Dinkins, or, perhaps, to Dinkins and Morse, and that they heard nothing about any partnership or division of the profits with the bank, or even with regard to the interest to be charged on the loans. And Reynolds testifies that he thinks that the money which was afterwards drawn from the bank was advanced under some “temporary arrangement,” though he does not say, by or with whom such arrangement was made.
The minutes of plaintiff’s board of directors, of August 20, 1908, read, in part, as follows:
“The president stated that Capt. Mark A. Morse, his son, and a Mr. Reynolds, chief engineer of the Public Belt Railroad, wanted to bid on levee contracts aggregating some 245,000 cubic yards. They desired to make a loan sufficient to meet running expenses, which, it was stated, would’ aggregate about $35,000, the loan to be secured by the indorsement of Capt. Morse and his associates. After discussion, Capt. Morse and Mr. Reynolds were asked to come before the board, and their proposition was discussed ; after which, it was moved by Mr. Fair-fax that the president be granted authority to contract with Capt. Morse and his associates, on the basis of one-third of the profits, and interest, which motion was duly seconded and carried.”
It is shown that on October 7, 1908, Reynolds & Co. received from the levee board an estimate (or payment on account) amounting to $23,870, and Reynolds testifies that the total profits, realized or to be realized, on the levee contracts, will be about $15,000.
Opinion.
Plaintiff alleges that the contract between it and the defendants was one of partnership, and prays for its specific enforcement. Defendants also assert and testify that the contract contemplated by them was one of partnership; the difference between them ■and the plaintiff being that they say that Lynn H. Dinkins, individually, and not the plaintiff bank, was the other party, and that there was no contract at all, because it was *204 a condition precedent that the agreement should he reduced to writing, which was not done. Plaintiff is a corporation, created under the laws of this state (Act No. 166 of 1855; Act No. 150 of 1888; Act No. 95 of 1892; and Act No. 45 of 1902) for the business of banking and has no authority, express, incidental, or implied, to enter into a contract Of partnership, or for the building of levees. The contract here sued on, therefore, falls within the prohibition of article 265 of the Constitution, which reads:
“No corporation shall engage in any business other than that expressly authorized by its charter, or incidental thereto,” etc.
And it is impossible to conceive how the -aid ,of a court, owing its existence and allegiance to the same Constitution, can he successfully invoked to enforce specific compliance with a contract so prohibited.
The weight of reason and authority, as we take it, now sustains the following propositions:
“When an ultra vires contract with a corporation has been fully performed, on both sides, neither party can maintain an action to set aside the transaction or to recover what has been parted with. * * *
“So long as an ultra vires contract is wholly executory on both sides, it is void, and neither party is estopped to deny the power of the corporation to make it. It follows that no action can be based upon such contract, either by the corporation or against it. * * *
“The fact that an ultra vires contract which is' executory on both sides has been partly performed will not entitle either party to maintain an action against the other to compel performance of the residue or to recover damages for failure to perform. * * *
“There is direct conflict of opinion as to whether, when an ultra vires contract with a corporation has been fully performed on one side, the party on which side it has been performed .may maintain an action against the other on the contract, or whether' the sole remedy, if1 any, is ex quasi contractu, in disaffirmance of the contract, to recover money paid under it, or the value of property delivered or services rendered. Some of the courts, including the House of Lords in England, the Supreme Court of the United States, and the Supreme Courts Of Alabama, Massachusetts, Tennessee, and several other states, have held that a contract with a corporation which is beyond its powers, or' ultra vires, though it may not be otherwise illegal, is absolutely void, on the ground that a corporation, by reason of its limited powers, is incapable of making such a contract; that the fact that the contract has been executed by one of the parties, and the other has thus received the consideration for his, or its, promise, cannot give the contract any validity; that such performance, by one of the parties, and-receipt of the consideration, by the other, does not estop the latter from setting up that the contract is ultra vires, since all persons are chargeable with knowledge of the powers of the corporation; and that no action, therefore, will lie, on the contract, itself, by the party on whose part it has been executed, the only remedy, if there be any at all, being quasi contractu, in disaffirmance of the contract and on an implied contract to recover the money paid or loaned, or the value of the property delivered or services rendered. * * * This, however, is not recognized in all jurisdictions. In New Xork, Pennsylvania, Wisconsin, New Jersey, and several other states, it has been held that, when a contract with a corporation, which is merely ultra vires, and not otherwise illegal, either because of its being expressly prohibited or because of its being contrary to public policy, has been fully executed by one of the parties, so that the other party has received the consideration of his, or its, promise, either in money, property, or services, the party on whose part the contract has been executed may maintain an action upon it, and the other party cannot defeat the action by pleading that the contract is ultra vires. * * * These courts proceed upon the theory that a contract with a corporation which is merely ultra vires, or beyond the powers conferred by its charter, is neither malum in se nor malum prohibitum, so as to be illegal, in the sense of the maxim ex dolo malo non oritur actio, and that public policy, as well as equity and justice, require that a party who has entered into such a contract with a corporation and received the benefit of the full performance by the other party shall be held estopped to set up the ultra vires character of the contract in order to escape liability upon it. * * *
“As a rule, if a contract with a corporation, instead of being merely ultra vires, is illegal, either because it is immoral or contrary to public policy, or because it is expressly or impliedly prohibited by statute or by the charter of the corporation, it is void, and no action can be maintained on it. But this rule does not apply in the case of contracts prohibited by the Legislature, where it appears that the Legislature did not intend the prohibition to have such-effect.”
Marshall on Private Corporations (1902) §§ 84, 85, 86, 93.
In the case of Central Transportation Co. v. Pullman Palace Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55, it appears that the contract sued on had been partly execut *206 ed, for several years, on both sides, and the .suit was brought to enforce its further execution during the term fixed in the contract. The Supreme Court, however, sustained the plea of ultra vires, and, in doing so, reviewed its entire jurisprudence, and said:
“The view which this court has taken of the question presented by this branch of the case, and the only view which appears to us consistent with legal principles, is as follows: A contract of a corporation which is ultra vires, in the proper sense, that is to say, outside the object of its creation, as defined in the law of its organization, and therefore beyond the power conferred by the Legislature, is not voidable, only, but wholly void and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot: be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity or be the foundation of any right of action upon it.”
In the case of California National Bank v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831, 42 L. Ed. 198, it appeared that the bank had made a purchase, unauthorized by law, of certain shares of stock in a savings institution, and that it was sought to be held liable, under the law of California, to the depositors of such institution in proportion to its holdings; and it was contended that it was estopped to set up the plea of ultra vires, by reason of the fact that it had received dividends' on the stock so held by it. The court, however, cited the above-quoted passage from the opinion in the case of the Pullman Palace Car Company, and other authority, on the main question, and, in regard to the alleged estoppel, said:
“The claim that the bank, in consequence of the receipt of its dividends on the stock of the savings bank, is estopped from questioning its ownership and consequent liability, is but a reiteration of the contention that the acquiring of stock by the bank, under the circumstances disclosed, was not void, but merely voidable. It would be a contradiction in terms to assert that there was a total want of power, by any act, to assume the liability, and yet say that by a particular act the liability resulted. The transaction, being absolutely void, could not be confirmed or ratified. As was said by this court in Union P. R. Co. v. Chicago, R. I. & P. R. Co., 163 U. S. 564, 581 [16 Sup. Ct. 1173, 1180] 41 L. Ed. 265, speaking through Mr. Chief Justice Puller: ‘A contract, made by a corporation, beyond the scope of its powers, expressed or implied, on a proper construction of its charter, cannot be enforced or rendered enforceable by the application of the doctrine of estoppel.’ ”
In the case of Robert Gair v. Columbia Rice Packing Co., 124 La. 193, 50 South. 8, plaintiff sued the rice packing company for á balance due on a contract, in execution of which it had furnished the packing company with certain cartons for packing rice, and it also sued the Crowley Rice Milling Company as the guarantor of the packing company, whereupon the milling company set up the plea of ultra vires, as to the alleged contract of guaranty, which plea was sustained; this court, through Mr. Justice Provosty, saying:
“It is elementary that a corporation possesses only these powers which its charter confers upon it, either expressly or by implication, or, as more fully stated in the case of Central Transportation Co. v. Pullman Palace Car Co., 139 U. S. 48 [11 Sup. Ct. 478, 35 L. Ed. 55]. * * * The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental. All contracts made by a corporation, beyond the scope of those powers, are unlawful and void, and no action can be maintained on them in the courts; and, this, tipon three distinct grounds: The obligation of every one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders, not to be subjected to risks they have never undertaken ; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law.”
In the case at bar, the plaintiff was specifically advised, by able counsel, before anything had been done towards the execution of the contract which it is here seeking to enforce, that it was utterly incapable of binding itself by such contract, and, if not so advised, was bound to know that it was prohibited by the Oonstitution of the state from engaging in the business in which it thereby *208 professed to involve itself. The money with which it parted was repaid to it, with the highest rate of interest allowed by our law, and if, from that time, or any time, it had refused to make further advances, it could not hhvebeen compelled to do so; nor if the levee building business of Reynolds & Co. had proved a disastrous failure, could it, or its stockholders, have been made liable for the losses, since Reynolds and Morse and the levee board and the surety company and everybody else connected with the matter, as well as the plaintiff, were bound to know that a bank, under our law, has no capacity to form a partnership or to engage in the business of building levees, but is prohibited from so doing. And as the plaintiff was under no obligation to proceed with the execution of the contract, and under no liability with respect to the consequences of so proceeding or of failing to proceed, it clearly has no standing to compel specific performance upon the part of any one else. In other words, as it was never, in legal contemplation, a party to the alleged contract, since it was incapable of becoming so, it has no standing to enforce it. And this, we think, is a sufficient answer to the argument that plaintiff has a right of pioperty in the levee contracts, since those contracts were awarded to Reynolds & Co., of which firm plaintiff never was, and never could have been, a member. Moreover, the right of property in question is asserted, not in disaffirmance of, but in the effort to enforce, the illegal and prohibited contract by which, as we have stated, plaintiff was never bound, and which it has no more capacity to enforce than it had to enter.
Our conclusion, then, is that this suit might very well have been dismissed upon the exception of no cause of action, and that the judgment, as rendered, cannot be sustained.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and ■ reversed, and that there now be judgment in favor of.the defendants, rejecting the demands of the plaintiff and dismissing this suit at plaintiff’s cost in both courts.