ROBERT K. CASSATT ET AL., PLAINTIFFS-APPELLANTS,
v. THE FIRST NATIONAL BANK OF WEST NEW YORK,
DEFENDANT-RESPONDENT.

Argued May 18, 1933—Decided October 16, 1933.

For the appellants, *George W. C. McCarter.*

For the respondent, *Hirschberg & Nashel* (*C. W. Tooke,*
of the New York bar, on the brief).

The opinion of the court was delivered by

CAMPBELL, CHANCELLOR. This is an appeal from a judg-
ment of nonsuit in an action where the plaintiffs below,
stock brokers, sought to recover from the defendant, a national
bank, the purchase price and their commissions, in a trans-
action involving the purchase, by the plaintiffs, of one hundred
shares of the common stock of the Baldwin Locomotive Works,

when, as and if issued, and two hundred shares of the common stock of the Crocker-Wheeler Company, when, as and if issued.

The complaint declares three distinct causes of action under six counts:

1. That the bank ordered the purchase of said stock for its own account.

2. That the bank ordered the purchase for an undisclosed principal.

3. That the bank is indebted to plaintiffs for stock sold and delivered and is likewise indebted to them for moneys laid out and expended for the purchase of such stock.

The answer was a general denial with separate defenses of the statute of frauds and that the transaction was *ultra vires* and therefore void.

The plaintiffs produced as a witness one Seaver, who, at the time of the transactions in question, was the manager of their Newark office.

He, at first, testified as to the Baldwin Locomotive Works stock transaction that he received the order for the purchase from Daniel Daume, the assistant cashier of the defendant, bank, and that such order was to buy the stock for the bank's account. Later he said that in a subsequent conversation with Daniel Daume he was told by the latter that the Baldwin stock was for him. On cross-examination he testified that he knew that Daniel Daume had a personal account with the plaintiffs, but that when the order to purchase was given he had not directed that such purchase should be made for him and upon his account, although said this witness, "I might have known that the stock was for him at the time of purchase." "This particular conversation was to buy one hundred shares of Baldwin Locomotive. My question is, 'into whose name or into whose account shall I put the stock?' in other words, on the ticket that I write out, I have to put the name of an account. * * * And he said, 'the First National Bank of West New York,' * * * I believe I asked him, 'is it for you?' and he said, 'yes.'" The witness further

said that he did not look to Mr. Daume for payment although he knew that the purchase was being made for him.

It is apparent to us, therefore, giving to this proof full credence, and it was all the proof that there was, that although the original order for this stock purchase was for the account of the bank, it was known to plaintiffs' office manager before the purchase of the stock was actually made that the order was for Daume, who had a personal trading account with the plaintiffs.

As to the Crocker-Wheeler stock purchase this same witness, upon direct examination, testified that such business was transacted with a Mr. Deyerberg, the cashier of the defendant, bank, that such transaction was by telephone, and although it does not definitely appear exactly what that order was it was one to buy at a price good until canceled; that such order was held for some days and then canceled "and there was no order existing for a number of days;" that at a later date, not fixed, there was a converastion between the witness and Charles Daume, a brother of Daniel Daume, assistant cashier of the bank, and that following this the witness was given instructions by the cashier, Dyerberg, to execute the order to purchase and the witness testified that, at some time, not fixed, Deyerberg had told him that one hundred shares of this stock was for him and the remaining one hundred shares for a customer of the bank, Charles Daume. On cross-examination the witness testified that at the time the original order for purchase was made he did not know that one hundred shares was for Deyerberg but that he understood that some of the stock was for Charles Daume and this he knew at the time of the purchase of the stock and subsequent to such purchase that one hundred shares was for Deyerberg. He further testified that he could not recollect "whether the name on the original order was the First National Bank or Mr. Charles Daume." Still later he testified that either at the time of receiving the order or at the time of purchase he "knew that Mr. Charles Daume was to get one hundred shares and that Mr. Deyerberg was to get the other one hundred shares." And then immediately, upon redirect examination

he testified that upon receiving the order to purchase he was directed by Mr. Deyerberg "to put the two hundred shares of Crocker-Wheeler stock into the bank's account."

Here again it appears to us that giving this proof full credit the situation was that the plaintiffs' manager knew that the purchase was for Charles Daume and Herman T. Deyerberg, although the latter directed the transaction to be made through the bank's account.

The nonsuit seems to have been granted upon the ground, generally, that the transaction as portrayed by the proofs, was *ultra vires*, the respondent, bank.

Appellants set down three grounds for reversal of the judgment, arguing them under three general points.

We will direct our attention to point three, first. Under subdivision "A" of this point appellant urges, that, aside from the question of *ultra vires*, the proofs were such as to make for a contract binding upon the respondent, bank, in that the order for the Baldwin stock was by Daume, the assistant cashier, approved and ratified, subsequently, by the cashier, by *Exhibit P-5*, and that the order for the Crocker-Wheeler stock was by the cashier, Deyerberg, who by section 21 of the bank's by-laws (*Exhibit P-6, page* 114) had authority to make and execute contracts for the bank.

This seems to be neither denied nor attacked and unless the contracts as established were *ultra vires* would have presented sufficient proof to have overcome the motion for nonsuit.

Under subdivision "B," dealing directly with the question of *ultra vires*, counsel for appellants, in his brief, says, "this is the great point in the case."

1. It is, beyond question, the important and controlling question.

Appellant's counsel concedes by the following: "We will commence by conceding that it is well established in law that a national bank is without power to buy stock in another corporation either for speculation or investment. National banks are not expressly prohibited from so doing. Merely it is the fact that such power is not conferred upon

them. This has been clearly recognized and laid down by the Supreme Court of the United States in many opinions \* \* \*."

This admission is acquiesced in by the respondent and, in fact, must be, because such is the unquestionable holding of the federal courts.

2. But, urge the appellants, it is not in every case that it is *ultra vires* for a national bank "to buy stock in another corporation or to own such stock," citing the act of Congress conferring corporate powers upon such banks. Title 12, U. S. Code, section 24, as amended, February 25th, 1927, Code 191, section 22, 44 Statutes at Large 1226.

But an examination of this act will show that the power of national banks to deal in securities is expressly limited, "to buying and selling, without recourse, marketable obligations evidencing indebtedness of any person, co-partnership, association or corporation, in the form of bonds, notes and/or securities, under such further definition of the term 'investment securities' as may by regulation be prescribed by the comptroller of the currency \* \* \*."

Appellants leave us without information as to what "definition of the term investment securities" the comptroller has given, if any.

We assume that such definition, if any, did not include highly speculative stock such as we are here concerned with. In this connection appellants cite, *California Bank* v. *Kennedy,* 167 *U. S.* 362, to which we shall hereafter refer, but upon the point here urged we conclude it has no applicability, under the proofs in the case before us.

3. Appellants further insist that a national bank, "as an incident to its ordinary banking business has the power to buy stocks \* \* \* where it buys them for a customer;" citing *Dyer* v. *Broadway Central Bank,* 252 *N. Y.* 430, and *Block* v. *Pennsylvania Exchange Bank,* 253 *Id.* 227.

We think that an analysis and respectful consideration of both of these cases will demonstrate that they have no authoritative application to the question before us.

Appellants urge that these cases, *supra,* are controlling

because under the proofs in the present case it is disclosed that the actual purchasers of the stock were Daniel Daume, assistant cashier of the respondent, Deyerberg, its cashier, who, although its officers, must be considered as customers, and Charles Daume who was neither an officer nor director and, therefore, purely a customer, although he was the brother of the assistant cashier, Daniel Daume.

Passing completely the question, which may not be before us, of the situation thus created and known to the plaintiffs and its effect factually upon its cause of action we revert to the significant language contained in *Block* v. *Pennsylvania Exchange Bank, supra,* upon which appellants strongly rely, viz., "this would not be doubted if, in ordering the securities it had given up the name of its customer with the result that the broker would look to the customer as principal. We think its power does not fail where it buys in its own name, the money being already in its coffer either through previous deposits or as the proceeds of a discount."

In the first place no proof in line with this appears in this case and, secondly, both of the cases were based upon suppositious situations respecting the sufficiency of complaints.

Again, and to repeat, that is not the situation displayed here to us.

Against this insistence of the appellants the respondent cites *First National Bank of Allentown* v. *Hoch,* 89 *Pa. St.* 325; *Hotchkin* v. *Third National Bank of Syracuse,* 219 *Mass.* 234; 106 *N. E. Rep.* 974, and *Jemison* v. *Citizens Savings Bank of New York,* 122 *N. Y.* 135.

To these may be added the text in 7 *C. J. tit. "Banks and Banking,"* 808, § 727, which asserts, "a national bank cannot act as agent or broker for others dealing in stocks, bonds, mortgages or other securities and especially in guarantying them, nor can it act as broker in lending the money of others. Nevertheless where a bank has lawfully received money or property it must account for the same or its proceeds notwithstanding an *ultra vires* agreement in this respect." Citing *Grand Forks First National Bank* v. *Anderson,* 172 *U. S.* 573; *Logan County National Bank* v. *Townsend,* 139 *Id.*

67; *Farmers, &c., National Bank* v. *Smith,* 77 *Fed. Rep.* 129, and cases in Arkansas, Nevada, Massachusetts and Pennsylvania.

All of these cases go to the point of sustaining the theory and principle set forth by the text writer but the decisions reach results because of peculiar and extraneous circumstances.

This is particularly true in all of them except *First National Bank of Allentown* v. *Hoch, supra,* which appears to be exactly in point.

This is also the text in 3 *R. C. L.* 423, § 51.

Counsel for appellants in his reply brief, while calling to our attention that *Jemison* v. *Citizens, supra,* and Hotchkin v. Third National Bank of Syracuse, are respectively distinguishable and the converse of the present proposition, admits that "*First National Bank of Allentown* v. *Hoch, supra,* might be distinguished from the case at bar, but, we say frankly, that any such construction would be fine spun. The long and short of it is that banking practice has grown since 1879 (the date of the decision in the Allentown bank case). First National Bank of Allentown *v.* Hoch, is really inconsistent with the two New York cases relied upon by us. * * * After reading them but one conclusion can be reached, namely, that the buying of securities for a customer by a bank on its credit is a legitimate banking business and is not *ultra vires* of a national bank any more than it is of a New York state bank."

Respondent cites as against this proposition *Merchants' National Bank* v. *Wehrmann,* 202 *U. S.* 295.

In addition to the foregoing citations there may be cited *First National Bank of Charlotte* v. *National Exchange Bank of Baltimore,* 92 *U S.* 122; *National Bank* v. *Case,* 99 *Id.* 628; *Logan County National Bank* v. *Townsend,* 139 *Id.* 67; *California Bank* v. *Kennedy,* 167 *Id.* 362, and *First National Bank of Grand Forks* v. *Anderson,* 172 *Id.* 573. Throughout all of these cases there is prominently displayed the fact that a national bank may neither directly, for its own account, nor as agent for a customer, legally enter into a contract to purchase speculative securities and if it undertakes to do so,

as is said in *California Bank* v. *Kennedy, supra,* "a contract made by a corporation beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced, or rendered enforceable by the application of the doctrine of estoppel."

This leads us to approve of the argument of the respondent, that, "it is a contradiction in terms to say that a national bank which has no power whatsoever, under the law, to purchase speculative securities directly may, nevertheless, make itself liable as a purchaser, by acting as an agent, for a customer of the bank. Such a conclusion would nullify the purpose of the statutory limitation upon its powers, which is to conserve the rights of its depositors and stockholders and enable it to perform, unimpaired, its functions as an agency of the federal government."

4. But, argue the appellants, this situation has been completely and entirely changed by act of congress (Title 12, U. S. Code, section 248 (K) of 1913), creating the federal reserve board and the granting, through it, of fiduciary powers to the respondent, bank.

This, as held by the learned trial judge is to be construed, *ejusdem generis, Reeves* v. *McCracken,* 69 *N. J. Eq.* 203; *Chapman* v. *Forsythe,* 2 *How.* 202; *Smith* v. *Baltimore and Ohio Railroad Co.,* 48 *Fed. Rep.* (2d) 861, and cases of a like character.

5. Appellants concede, in their reply brief, that an agent who contracts for a disclosed principal (which is the case here) assumes no personal liability but says that this is not a hard and fast rule, if a contrary intention is shown and particularly if it is shown that the parties to the contract relied upon the credit of the agent, citing *Sadler* v. *Young,* 78 *N. J. L.* 594; *Drill Co.* v. *Rosenthal,* 8 *N. J. Mis. R.* 666; *Jones* v. *Littendale,* 6 *Ad. & E.* 486 (*English Kings Bench,* 1837), and urges that "in the case at bar there was certainly evidence from which the jury might find that the sale was made by the plaintiffs on the credit of the bank as agent."

But here the appellants are confronted by the fact that the contract alleged as against the bank was *ultra vires*.

In the matters of this character, the respondent urges that state courts follow the construction of federal statutes as laid down by the federal courts, citing *Boerner* v. *Trader's National Bank,* 90 *Tex.* 443; 39 *S. W. Rep.* 285; *Chemical National Bank* v. *Havermale,* 120 *Cal.* 601; 52 *Pac. Rep.* 1071; *Appleton* v. *Citizens National Bank,* 190 *N. Y.* 417; *affirmed,* 216 *U. S.* 196.

This is so.

Further that persons dealing with national banks are charged with notice of their limitations, citing *McCormick* v. *Market National Bank,* 165 *U. S.* 538, 550, and *California Bank* v. *Kennedy, supra.*

This also is undoubtedly so.

And further that the respondent would not be estopped if the *ultra vires* contract had been executed, citing *Central Transportation Co.* v. *Pullman Car Co.,* 139 *U. S.* 24, 25; *McCormick* v. *Market National Bank,* 165 *U. S.* 538, 549; *Pullman Car Co.* v. *Transportation Co.,* 171 *Id.* 178.

By these authorities this must also be conceded.

We conclude, therefore, that from every angle of viewing the proofs in this case the alleged undertaking of the respondent was *ultra vires* and could not be enforced against it and therefore the judgment of nonsuit was not erroneous.

This brings us to the two remaining points argued as error.

Point 1. That the trial judge erred in sustaining the objection to the following question:

"I believe you previously told us that you had had an account with the bank for a number of years. Will you now state whether or not any of the securities purchased by the bank during that period was to your knowledge for customers of the bank?"

Assuming that we are correct in the conclusion that we have reached that admittedly a national bank cannot deal for itself and on its own account in the class of stock here involved, being absolutely without power to so engage and contract, and that such power does not reach to an undisclosed principal, therefore, where the parties rely upon the credit of the agent and not the principal, we cannot see how former

transactions and course of dealings between the appellants and respondent can change the situation and cast a legal responsibility upon the respondent to answer.

We conclude that the exclusion of the answer to this question was not error.

Point 2. The trial court erred in excluding from or refusing to admit in evidence *Exhibit P-15*.

That which has been said in answer to point 2 of appellants' brief is applicable here and the same result is reached by us thereon.

The judgment under review will be affirmed, with costs.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 15.

*For reversal*—None.